## M. A. LONG COMPANY v. STATE ACCIDENT FUND.
[No. 101, October Term, 1928.]

*Decided February 15th 1929.*

The cause was argued before BOND, C. J., ADKINS,. OFFUTT, DIGGES, and PARKE, JJ.

*Clarence A. Tucker* and *Joseph Townsend England,* with whom were *Knapp, Tucker & Thomas* on the brief, for the appellant.

*Willis R. Jones* and *Thomas E. Mason,* for the appellee..

DIGGES, J., delivered the opinion of the court.

The appellee in this case, the State Accident Fund, as; compensation insurer, in its own right and for the use of

Eugene Lappielly, recovered a judgment in the Baltimore City Court against the appellant, the M. A. Long Company, a body corporate, for $16,000, under the provisions of section 58 of article 101 of the Code (Workmen's Compensation Law). Judgment was entered upon the verdict of the jury for that amount, and the appeal is from that judgment.

The appellant's contentions which are seriously pressed in this court and upon which it relies for a reversal, are that the lower court erred in rejecting its prayers which asked for an instructed verdict for the defendant on three grounds: First, because the provisions of article 101 made the appellant liable to the payment of compensation to Lappielly, the injured party, and therefore it was immune from a common law action based upon negligence; second, that there is no evidence in the case legally sufficient to support a verdict for the plaintiff; and, third, that the record discloses such contributory negligence on the part of the plaintiff as would bar recovery. There are two exceptions in the record, the second of which raises the propositions of law above stated, while the first is to a ruling of the court on the admission of evidence.

This first exception relates to the action of the court in permitting a question and answer of the witness Beck, who was the foreman of the employer of Lappielly, at a time when he was recalled. In his examination in chief on the day previous he was asked this question: "Q. During that day (referring to the day of the accident), had you seen any of Long's foremen or superintendents up there? (Meaning up on the job.) A. Well, I couldn't say that I did not or did, because I don't know that day much different from any other day, they were always around, all over the building." When he was recalled, the witness testified without objection that the foreman of Long was almost continuously on the job: "Q. And when you say on the job, what do you mean, what job? A. In the building, that is, at that stage of the building there was only the first floor and the second

floor that we were working on. Q. Where was he? A. He was on both the first and second floor, he was all over those two floors. Q. During this day of the accident, how many times did you see him up on the second floor, as nearly as you can tell us? A. I judge I seen him, well, it would only be a guess. Q. About how many times did you see the Long superintendent or foreman on the second floor during the day of this accident prior to the occurrence of the accident? (Mr. Tucker): I object to the question. (The Court): He can tell if he knows how many times, or he can say if they are many or few, he can answer in any way, but he cannot guess at it. (Mr. Tucker): The ground of our objection is because the witnses himself said it would only be a guess." The court overruled the objection and permitted the witness to answer: "Well, I will say at least once an hour." The purpose of this question was to show that the appellant's foreman or superintendent was at the scene of the accident frequently during the day of the accident, and while the witness said that he had seen the superintendent there, but, if he stated the number of times, it would only be approximate or a guess, the court permitted the witness to say how many times, if he knew, or to say whether his visits were many or few; whereupon the witness said that the superintendent or foreman was on the second floor of the building at the scene of the accident at least once an hour prior to the accident. The accident occurred about three o'clock, and from this answer of the witness the jury could conclude how frequently the superintendent was there before the accident. The witness could not say positively how many times he was there, but he was positive that he was present at least once an hour. There is no error in this ruling.

In order to intelligently discuss the questions raised by the second exception, relating to the ruling on the prayers, it is necessary to consider the facts surrounding the accident resulting in the injury for which the judgment was obtained, which we shall do as briefly as possible in narrative form. The appellant is a building contractor and had entered into a contract with Johns Hopkins University for the construc-

tion of what is known as the School of Hygiene, located in Baltimore City. By the eighth article of this contract it was provided: "The owner (Hopkins) will make direct contracts for the heating and ventilating, the plumbing, drainage, etc., the electric wiring, tubing, etc., and the refrigerating equipment. The contractor (M. A. Long Co.) agrees to assume control over the contractors for the above mentioned mechanical equipment to the same extent as though they were his subcontractors, except as to the provisions of payment and financial responsibility." No other provisions of this contract are necessary for the consideration of the questions involved. Subsequently Hopkins made a contract with James McCrea & Son for the installation of the heating, ventilating, plumbing, drainage, electric wiring, tubing, and refrigerating equipment; and by article 10 of this contract it was provided: "Except as to the provisions of payment and financial responsibility, the contractor agrees to be under the control of the general building contractor to the same extent as though the former were a subcontractor to the latter." McCrea & Son in turn contracted with the Electro-Mechanical Company, the direct employer of Lappielly, for the installation of the electrical equipment, including wiring, tubing, etc., and by section 9 of this written contract it was provided: "Except as to the provisions of payment and financial responsibility, the subcontractor agrees with the contractor to be under the control of the general building contractor to the same extent as though the former and the contractor were subcontractors to the latter." Lappielly was employed by the Electro-Mechanical Company and sent to work on the School of Hygiene building, and had been at work about two weeks before September 12th, 1924, the day upon which the accident occurred. Upon these facts rests the first contention of the appellant, to wit, that the Workmen's Compensation Law applies, and that compensation under the act could be awarded against the appellant, and therefore it is immune from a common law action; its contention in this respect being that the clauses of the various contracts above set forth

constituted the Electro-Mechanical Company a subcontractor of the Long Company, and that this being true, section 62 of article 101 provides that the employee of a subcontractor can demand and be awarded compensation either from the subcontractor, his immediate employer, or from the principal contractor, and, being entitled to receive compensation from the principal contractor, the Long Company, by force of the statute, it is not liable to a common law action based upon its negligence. If the premise here argued were correct, the authorities would sustain the result contended for; but before we can reach the conclusion of immunity from a common law action, we must find that the appellant and the employer of Lappielly occupied the relationship of principal contractor and subcontractor in respect to each other. It may be that the statute law should, under the circumstances disclosed by this record, create such a relationship; but as it now stands, it does no such thing.

Section 62 provides: "When any person as a principal contractor, undertakes to execute any work which is a part of his trade, business or occupation which he has contracted to perform, and contracts with any other person as subcontractor, for the execution by or under the subcontractor, of the whole or any part of the work undertaken by the principal contractor, the principal contractor shall be liable to pay to any workman employed in the execution of the work any compensation under this article which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings taken against the principal contractor, then, in the application of this article, reference to the principal contractor shall be substituted for reference to the employer. * * * Where the principal contractor is liable to pay compensation under this section, he shall be entitled to indemnity from any employer, who would have been liable to pay compensation to the employee independently of this section, and shall have a cause of action therefor against such employer." Section 36 provides: "Each employee (or in case of death his family or dependents) entitled to receive compensation under this

article shall receive the same in accordance with the following schedule and except as in this article otherwise provided, such payment shall be in lieu of any and all rights of action whatsoever against any person whomsoever." Section 14 provides: "Every employer subject to the provisions of this article, shall pay or provide as required herein compensation according to the schedules of this article for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment without regard to fault as a cause of such injury. * * * The liability prescribed by the last preceding paragraph shall be exclusive, except that if an employer fails to secure the payment of compensation for his injured employees and their dependents as provided in this article, an injured employee or his legal representative in case death results from the injury, may, at his option, elect to claim compensation under this article, or to maintain an action in the courts for damages on account of such injury."

The effect of these provisions of article 101 is to give to a principal contractor, under conditions set forth in section 62, the status of an employer under the act. The question, therefore, is, are the facts of the present case sufficient to constitute the Long Company the statutory employer of Lappielly? It is clear they do not. The meaning of section 62 is that, in order to create a principal contractor the statutory employer of a workman of a subcontractor, the subcontractor must be engaged in the work or a portion of the work which the principal contractor agreed to perform. Or, in other words, to create the principal contractor a statutory employer he must have contracted in the first instance to do the work himself, and subsequently sublet the whole or a portion of it to someone else. Under such circumstances the employees of the person or corporation to whom the contract or a portion thereof is sublet become the statutory employees of the principal contractor. We can arrive at no other conclusion from the language employed in the act, even if it had not been previously so interpreted by this court. In the case of *State v. Bennett Bldg. Co.*, 154 Md. 159, Judge

Parke, speaking for the court, said: "Although acting independently of the other, the principal contractor and the subcontractor, with his workmen employed in the execution of the work, were each, in his own separate capacity, co-operating towards the execution of the whole of a particular work which the principal contractor had promised to perform; and the liability of the principal contractor to pay compensation to the employees of the subcontractor is confined to only these employees who were actually engaged in the execution of the whole or a portion of that one piece of work at the time of injury. It is this necessary employment of the employees of the subcontractor upon the piece of work which the principal contractor has agreed to perform that forms the basis of the statutory relation between the workman and the principal contractor, and, although it does not establish the relation of master and servant, as known to the common law, because of the intervention of the subcontractor as the workman's master, yet the act creates a status which for the purpose of the act is that of employer and employee, as is explicit in the provision of section 62 that the principal contractor must pay compensation 'as if that workman had been immediately employed by him.' "

Applying the test set up by the statute and laid down in an opinion of this court interpreting the statute, do the facts of this case establish between Long and Lappielly the relationship of statutory employer and employee? Clearly they do not, for the reason that Lappielly's immediate employer, the Electro-Mechanical Company, was not engaged in doing work which the Long Company had contracted or agreed to perform; but on the contrary, there was no contractual obligation on Long's part to do the work being done by Lappielly's immediate employer. It is undoubtedly true that the Long Company, by the clauses of the various contracts herein set forth, had general supervision over all other contractors working on the School of Hygiene to the same extent as if they were his subcontractors, with the exception of liability for payment and financial responsibility; but these provisions do not bring about the relationship required

by the statute to constitute Long the statutory employer of Lappielly. Neither do we think it was intended by the parties that the relationship of contractor and subcontractor should exist any further than giving to the Long Company such supervision over the other contractors on the work as would enable it to have the whole work conducted orderly and without confusion. Be this as it may, it is certainly clear that the Long Company did not contract to perform the electrical wiring work, and in the absence of its liability to do that work it cannot be held to be the statutory employer of Lappielly. The appellant relies upon *Catalano v. Corp.*, 255 Mass. 605, and *Bindbeutel v. Willcut & Sons Co.*, 244 Mass. 195. Upon an examination of these cases we are of the opinion that they go no further than this court has done in the case of *State v. Bennett Bldg. Co., supra.* In those cases it was not disputed that the relationship was that of principal and subcontractor, but we do not interpret them as deciding that independent contractors engaged in the common enterprise of constructing a building are immune from a common law suit, for injuries resulting from their negligence, by an employee of another contractor, because said employee has been awarded compensation from his immediate employer. If they did, the language of our statute and the former decision of this court would prevent us from following any such interpretation.

The School of Hygiene was being constructed of steel and reinforced concrete throughout, including the floors. It fronts 180 feet north and south on Wolfe Street and is in the shape of a letter "E," having three wings, one at the north end, one at the south end, and one in the center. The depth of the main building, exclusive of the wings, throughout its entire length is 51 feet 4 inches; the depth of the north and south wings is 27 feet, and the center wing 35 feet 6 inches; so that the depth at the northern and southern ends, including the wings, is 78 feet 4 inches, the center wing, together with the main building, being 86 feet 10 inches in depth. Lappielly was employed by the Electro-Mechanical Company, and was injured by being precipitated from a

place on the second floor near the center of the center wing to the floor below, about 3 o'clock in the afternoon of September 12th, 1924, at which time the building was in the course of construction.

The method of construction, as shown by the record, is that, after the steel framework of the building is up, or up for a certain number of floors, a temporary forming is then erected preparatory to pouring the concrete, the purpose of this forming being to hold the concrete until it hardens or sets. After the steel work is in place, each floor has the appearance of being laid off into squares or "bays," the sides of each of which are formed by the steel beams. These bays are between 11 and 12 feet square and are in condition for the erection of the temporary forming. The forming is made by laying across each bay 2 by 6 inch pine joists, the ends of which rest upon the steel beams. These joists are spaced from 22 to 30 inches apart. There is nailed upon either side of each of these joists, 1½ inches from the top, wooden strips or cleats 2 by 4 inches in size. This operation being completed, there is then laid between the joists, and resting upon the cleats, steel pans 1½ inches thick, forming what is called a "decking." After the steel pans are laid the construction has the appearance of a level floor, these pans or sheets, together with the top edges of the joists, forming the bottom surface upon which there is then placed hollow tile and concrete reinforcement, and upon which the concrete is poured to form the floor. After the joists and pans are laid, and before the concrete is poured, there are put, under the joists, braces, the upper ends being under the joists and the lower ends thereof resting upon the concrete on the floor below. This operation is called "shoring," and is for the purpose of bracing and strengthening the joists so as to bear the weight of the concrete when poured, until the same hardens or sets. By a screw device on these shores or braces, the surface of the floor above is leveled before the concrete is poured.

It is conceded by both parties that the mechanical trades, such as the plumbers and electricians, are required to do

their work on each floor before the concrete is poured, but they differ as to what point in the construction is the proper time for the mechanical trade workmen to enter upon the temporary forming; the evidence on the part of the appellant being that they are not supposed to work upon the decking until it has been shored, while the appellee claims that they are supposed to begin their work as soon as the decking is laid, without reference to the shoring, the only purpose of which shoring is, according to their view and according to some of the testimony, to bear the weight of the concrete. There is conflict in the testimony on this point, which it was the province of the jury to decide.

At the time of the accident the bay in which had been placed the alleged defective joist had been completed to the point of setting the joists and laying the steel pans forming the decking, but had not been shored. This bay was located about the center of the center wing of the building, and upon it had been placed a small table upon which were the blue prints containing specifications and directions for the guidance of the plumbers and electricians. Under this table there was a bucket of water or lemonade. The plumbers were also at work on the second floor, and the record shows that they, as well as Lappielly, went to the table for the purpose of either consulting blue prints or getting something to drink. At about 3 o'clock on that day two of the plumbers, each weighing 246 pounds, and Lappielly, weighing 155 pounds, were near the table close to each other; at which time one of the 2 by 6 joists broke, precipitating the three of them to the floor below, Lappielly underneath and the other two men falling upon him. It was this fall which occasioned the injury to Lappielly.

An examination of the joist which broke disclosed that at the point of breakage it contained two tight knots, one running from the top of the joist to within about two inches of the center, and nearly opposite that point, and about two inches farther down, the second knot continued to the bottom of the joist, thus leaving at that particular vertical line in the joist only about two inches of timber free of knots. The

650

record further discloses that the grade of timber used in these joists is what is variously known to the trade as short leaf Virginia pine, of a grade known as "sound and square edge"; that because it is of the short leaf variety of pine there are nearly always knots to be found in the same; that this is the usual and customary type and grade of lumber used by contractors and builders for erecting temporary formings, the purpose for which this lumber was intended and used. There is no contradiction on this point, it being in evidence that the appellant used shortly before and after this accident as much as 7,000,000 feet of lumber of similar grade and type for such purposes, and that it was generally and customarily used by contractors and builders.

The general principle invoked by the appellee, upon which the right to recover is based, is that an employer owes the duty and is under the obligation to furnish his workmen or servants a safe place in which to work, and if injury results to a workman by reason of the employer's failure in this duty or obligation, the employer is liable. There is no dispute as to the legal principle, but it does not follow that this principle is applicable under all circumstances. What the employer is bound to do is to exercise due care to provide safety for his workmen, and what may be or may not be due care depends upon the circumstances of each particular case. In other words, due care is a relative term, varying in many cases. The test of what is due care in a particular case is whether it is such care as the average prudent and careful man would exercise under similar circumstances. The question in this case, therefore, in the final analysis, depends upon whether the appellant did or left undone anything which resulted in injury to Lappielly, which the average careful and prudent man would not have done or left undone under such circumstances. If the average prudent and careful man would have done what the appellant did in this case, there is no actionable negligence on the part of the appellant, even though an accident occurred which resulted in Lappielly's injury. It is contended by the appellee that, although it was customary and usual to use lumber for the

purpose for which this lumber was used, containing knots, nevertheless the employees of the appellant who used this particular joist were negligent in not discovering that the peculiar situation of these two knots, which weakened the piece of lumber, rendered the piece so weak as to be unfit for use; and it is upon this contention that the appellee must rely for recovery, because there was no negligence on the part of the appellant in buying and using the grade of lumber which was customarily used by contractors and builders for the purpose of erecting temporary formings.

It is to be noted in this connection that this piece of lumber was used for a temporary purpose in the course of construction of a large building, where many temporary structures are necessary in carrying on to completion the permanent building, and that this particular temporary structure had not been completed for the entire use for which it was being temporarily constructed; that all of the workmen or employees of other contractors engaged in doing other work on the building knew that the forming was not a permanent construction; and it is practically certain that, if the temporary construction had been completed by being shored, an injury such as here complained of could not have happened. By the very nature of things, workmen around a building of this kind are required to use and do use temporary structures, which, if they were intended for permanent use, would be unsafe, and which in the latter event would subject the employer to a suit for injury resulting from such construction. In the recent case of *Decatur v. Tompkins Co.*, in the Court of Appeals of the District of Columbia, reported in 25 *Fed.* (2nd Series) 526, the suit was by an employee for damages resulting from an injury occasioned by stepping upon a nail in a piece of board partially covered by earth around a building in the course of construction. The lower court directed a verdict for the defendant, and on appeal the Court of Appeals said: "We think this ruling was right. It is true that in general an employer is bound to furnish his employee with a reasonably safe place in which to work. But in the erection and construction of buildings this rule can

have but a limited application; for it most often happens that the dangers of such work are open and obvious, and hence that the risk of accident is assumed by the employee. *Walaszewski v. Schoknecht,* 127 Wis. 376. This is especially true where the danger to which the employee is exposed is merely transitory, due to no fault of plan or construction, and where the environment of the employees must necessarily undergo frequent changes. *Armour & Co. v. Dumas,* 43 Tex. Civ. App. 36. It has been said that 'the obligation of a master to provide reasonably safe places and structures for his servant to work upon does not extend to buildings in process of construction, or of demolition or dismantling, where the successive temporary conditions through which such structures must pass in such operation must from the very nature thereof be dangerous.' 39 *C. J.,* p. 351. In *Armour v. Hahn,* 111 U. S. 313, 318, it is said that 'the obligation of a master to provide reasonably safe places and structures for his servants to work upon does not impose upon him the duty, as towards them, of keeping a building which they are employed in erecting, in a safe condition at every moment of their work, so far as it depends upon the due performance of that work by them and their fellows.' These principles preclude a recovery by plaintiff in this case. The condition from which plaintiff's injury arose was a well-known incident of the work on and about the building, and the plaintiff was fully aware of that fact. He knew that board ends with nails projecting from them were often thrown upon the embankment from the upper floors of the building and he had seen this happen upon that same morning before the accident occcurred. He states that the scraps were partly covered by fresh dirt, and that he saw none about his trestle, but after the accident happened he noticed many such scraps scattered 'all around' upon the embankment, only partly covered up with dirt. Various other points are presented by the appellees, but we need not discuss them, for under the circumstances disclosed by plaintiff's testimony it must be held that he assumed the risk of such a condition as this as part of his contract of employment. See *Schneider v. American Bridge*

*Co.,* 31 App. D. C. 420, 36 Wash. Law Rep. 379; *Anderson v. Smith,* 35 App. D. C. 93, 38 Wash. Law Rep. 330; *Spates v. Wells Brothers,* 43 App. D. C. 555, 43 Wash. Law Rep. 357; *Kreigh v. Westinghouse & Co.,* 152 Fed. 120; *McElwaineRichards Co. v. Wall,* 166 Ind. 267; *Beique v. Hosmer,* 169 Mass. 541; *Walton v. Bryn Mawr Hotel Co.,* 160 Pa. 3."

In the case of *Joyce v. Flanigan,* 111 Md. 481, 496, Judge Pearce, speaking for this court, said: "The argument of the appellant, when carefully analyzed, seems to go to the extent of requiring the master to insure the servant a safe place in which to perform his work, though it is not expressly so declared. * * * We are not to be understood that defendants would be held blameless if there was evidence that in the prosecution of this work they had neglected precautions required by the rules of the trade, or even in the absence of such rules, if there were evidence of any conditions in the soil which should have excited apprehension in the mind of ordinarily careful and prudent men of impending danger. But we cannot without disregarding our own decisions require of them the same standard of care required of scientific experts. It is sometimes inadvertently said that the master is bound to furnish his servant a safe place in which to work, but this is inaccurate and misleading. He is bound in so far as that he cannot delegate that duty to another, but he is only bound 'to exercise reasonable care in providing a reasonably safe place to do the work required of his servant; that is, to guard him against probable, but not possible danger. * * * He is not expected to be omniscient; hence the rule that he is not to be held as the insurer of the safety of the servant.' *Lawless v. Laclede Gas Light Co.,* 72 Mo. App., citing *Pollock on Torts,* page 45. The true rule has been nowhere better stated than in *Titus v. Bradford R. R.,* 136 Pa. 626, in which the court said: 'Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences not of danger, but of negligence, and the unbending test of negligence in methods, machinery and appliances, is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair

average of his profession or trade, and the standard of due care is the standard of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced there is a better and less dangerous way, no jury can be permitted to say that the usual and ordinary way commonly adopted by those in the same business is a negligent way.' In *Kelly v. Forty-second St. Rwy.*, 58 Hun. 93, the court said: 'What the law exacts from the employer is the exercise of reasonable care and intelligence for the protection and safety of the persons employed. And when that is observed, the happening of what is at most only a possible accident, is part of the risk of the employment.' "

As before stated, the question of whether a certain act is or is not negligence depends upon the circumstances of the particular case; or as said by Judge Offutt speaking for this court in the case of *Ches. & Pot. Tel. Co. v. Merriken*, 147 Md. 577, where the court was dealing with an act said to constitute contributory negligence: "To justify a court in characterizing conduct as negligent in law it must involve some 'prominent and decisive act, in regard to the effect and character of which no room is left for ordinary minds to differ.' *Waltring v. James*, 136 Md. 414. The ingredients of contributory negligence do not differ in any respect from those of primary negligence; it is, after all, 'like primary negligence, relative and not absolute, and being relative it is dependent on the peculiar circumstances of each particular case. There are many acts which would not be negligent when done under some conditions, though the same acts if done under different conditions might be highly negligent. * * * So ultimately, in every case of this character it becomes necessary to view the entire surroundings to determine whether either primary or contributory negligence has been established.' *McNab v. United Rwys. Co.*, 94 Md. 724. These principles have been so often and so recently stated by this court that it is unnecessary to do more than refer to *Merrifield v. Hoffberger Co.*, 147 Md. 134, and *Pierson v. Lakin*, 147 Md. 1."

In our opinion, notwithstanding the failure of the employee of the appellant to detect the weakness of the particular joist which broke, due to the presence of knots, when that joist was only to be used in a temporary structure, and when it is shown that it broke before the temporary structure was completed, and further, that, in the purchase of the lumber of which the broken joist was a part, the type and grade used was that usually and customarily used by contractors and builders generally, the grade being such as usually contained knots, there was no actionable negligence on the part of the appellant, and the jury should not have been permitted to bring in a verdict for the plaintiff because they may have believed there was a better and safer way to have constructed the temporary forming. It follows that the trial court erred in not granting the defendant's "A" prayer, directing a verdict for defendant, and for this reason the judgment must be reversed.

Holding this view, it is unnecessary to pass upon the other questions raised in the case.

> *Judgment reversed, without a new trial, with costs to the appellant.*

ADKINS, J., filed a concurring opinion as follows:

In concurring in the opinion filed in this case, I am influenced by an additional reason not emphasized therein.

The overwhelming weight of the testimony is that in the condition of the work at the time of the accident the floor at the point of the accident was not intended to support the weight which broke it down; and in my opinion there was not more than a scintilla, if any, evidence to the contrary. Of course, the burden was on plaintiff to prove the existence of the duty which he claims was violated.

OFFUTT, J., dissents.