520 A.2d 717

Eileen Marie BRADY et al.

v.

The RALPH PARSONS COMPANY.

No. 44, Sept. Term, 1986.

Court of Appeals of Maryland.

Feb. 2, 1987.

William J. Blondell, Jr. (Stephen W. Lafferty, William J. Blondell, Jr., Chartered, on the brief), Baltimore, for appellants.

Edward C. Mackie and Paul J. Weber (Rollins, Smalkin, Richards & Mackie, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

COUCH, Judge.

I

On January 28, 1981, Donald C. Brady, Jr. sustained serious injury in a fall from a scaffold erected during construction at the Cold Spring Lane Station of the Baltimore Region Rapid Transit System (Baltimore Subway or BRRTS). He died several hours later. At the time of his

death, Brady (the decedent) was an employee of the Rocky Mountain Skylight Company (Rocky Mountain), one of several companies hired to assist in the construction of the Cold Spring Lane Station. The Cold Spring construction was part of a large project, partially funded by the federal government, to construct approximately twenty eight miles of track and twenty stations along the northwest and south corridors of a specified region.[1]

The Mass Transit Administration (MTA), an instrumentality of the Maryland Department of Transportation,[2] is the owner of the Baltimore Subway and its subsidiary stations.[3] The MTA entered into three main contracts for the construction of the Cold Spring Lane Station. First, MTA contracted with the Baltimore Regional Insurance Transit Services (BRITS) to develop and recommend, *inter alia*, a coordinated safety program "to protect the MTA, its contractors, invitees and the public during the construction and testing of the PHASE I BRRTS." To this end, BRITS produced a safety and reporting procedure manual (Construction Safety Manual or Manual) which, the document suggested, outlined a "practical, sound and effective program for the prevention of accidents," and assigned "specific responsibilities to contractors for program compliance." [4]

---

1. The Maryland Department of Transportation entered into an Urban Mass Transportation Capital Grant Contract with the United States to build the Baltimore Subway. The Mass Transit Administration is a grantee under the contract and has the responsibility to design, build and operate the subway. The project has been referred to in various documents as "PHASE I BRRTS." The initial section of the project is 8.5 miles in length and includes ten stations.

2. *See* Md.Code (1977, 1986 Cum.Supp.), Transportation Art., §§ 7-201, 7-208.

3. Neither party disputes that MTA is the owner of the Baltimore Subway and its subsidiary stations.

4. The Construction Safety Manual continued:
 This basic safety program has been designed to assist all site contractors and their supervision [sic] to recognize, evaluate, and subsequently control hazardous activities or conditions within their respective areas of contract responsibility.

All contractors were required to insure that all employees, subcontractors and suppliers, while on the job site and in the conduct of MTA contracts, would comply with the provisions of the Manual.

Secondly, MTA contracted with the appellee, The Ralph Parsons Company (Parsons), to be the Construction Manager (CM) of the project site. In this role, Parsons was to provide construction management, supervisory, inspection and safety services for MTA. Finally, MTA contracted with Hensel-Phelps Construction Company (Hensel-Phelps) to be the principal contractor on the project. Under the Construction Safety Manual, Hensel-Phelps had specific safety duties, including the appointment of a Safety Superintendent who would be in charge of performing safety inspection services. Construction Safety Manual § 1.4.2b.[5] Hensel-Phelps subcontracted a portion of the construction work to the decedent's employer, Rocky Mountain, a sheet metal contractor.

Schematically, the contractual relationship among the various parties is the following:

---

The minimum accident prevention activities expected from each contractor is indicated in each of the following program sections; less than those minimums will be considered substandard.

The Manual also required compliance with all federal, state and local laws, and specific standards established by safety and trade organizations.

**5.** Hensel-Phelps produced a detailed safety plan to effectuate the Construction Safety Manual.

In April of 1982, the decedent's surviving family, the appellants,[6] filed (and later amended) the present tort action in the Circuit Court for Baltimore City against the appellee [7] for the latter's negligent performance of its contractual safety responsibilities at the construction site. As construction manager of the project, the appellee had specific contractual safety duties and responsibilities. According to its contract with MTA:

The CM shall provide safety engineering services, coordinated with BRITS, necessary to develop and ensure the application of a uniform system of safety and accident prevention and reporting procedures. The CM shall also provide safety engineering services as required to ensure compliance with the provisions of the MTA Construction Safety Manual; the contractual obligations of MTA contractors, other applicable guidance. The CM shall also direct contractors to correct any unsafe acts or conditions that may be detected.

---

6. The decedent was survived by his wife, Eileen Marie Brady, and two children, John Brady and Kimberly Brady.

7. Other parties that were originally named as defendants in the present action have been dismissed.

Parsons Contract § 2.02.2HH. *See id* at § 1.05.2B ("The CM shall enforce compliance with the safety program.") [8]

During the construction phase of the project, the appellee was required to

Provide a qualified, full-time, on-site supervisory staff for the management and inspection of all construction work being performed on the Project. Responsibilities assigned the staff shall include, but not necessarily be limited to, the following:

(1) Coordinate the activities of contractors.

(2) Continuously monitor contractor schedules and manpower usage to insure compliance with contract terms.

. . . . .

(4) Coordinate the movement of equipment and material through job sites.

(5) Recommend construction techniques to expedite the Project and assure job safety.

*Id.* at § 2.02.2G. The contract further specified that the appellee was to prepare a monthly report on the individual construction contracts and on the construction program in the aggregate, including the status of safety programs. *Id.* at § 2.02.2H(1)(a).

------

**8.** Pursuant to its contract, the appellee prepared a Policies and Procedures manual for management of the MTA construction. Section 4 of the manual, entitled "Safety Procedures," outlined procedures, responsibilities, and lines of communication for implementing the Construction Safety Manual.

Both parties agree that, at a minimum, the appellee had to oversee all safety programs developed for the project, to report any violations of federal, state and local laws or of the Construction Safety Manual, and to direct contractors to correct unsafe acts that may have been detected.[9]

On November 12, 1985, the appellants moved for summary judgment on the issue of liability. They argued, *inter alia,*

> By contractually assuming responsibility for safety on the construction project, Parsons is liable for the failure to properly implement the applicable safety regulations, including those promulgated and executed by contractors and subcontractors.

> . . . . .

> Parsons had a duty to take reasonable precautionary steps to protect the employees on the subway, such as Donald Brady, from ... clearly foreseeable dangers.

> . . . . .

> Since the Construction Manager, Parsons took no precautions to prevent the fatal fall, it is liable for the negligence which caused Donald Brady's death.

Nine days later, the appellee answered the appellants' motion and filed a cross motion for summary judgment.[10] Among its various arguments, the appellee contended that it was entitled to statutory immunity under the Workmen's Compensation Act for the injuries and death of the decedent. The gist of the appellee's argument was as follows:

> Pursuant to Annotated Code of Maryland, Article 101, Section 62, ... Hensel-Phelps was the statutory employer

---

**9.** However, the appellee argues, *inter alia,* that it was not required to provide perpetual inspection, to be on the project site at all times, or to inspect the scaffolding before and after each use.

**10.** The appellee had previously filed a motion for summary judgment against the appellants as to three of the counts in the amended complaint. That motion argued that the appellee "undertook no duty to [appellants'] decedent to see to it that the said decedent's employer provided scaffolding that was safe for the decedent's use."

of all employees of its subcontractors, and as such had the duty to provide them with a safe place to work. As such statutory employer, it is immune from tort suit by such statutory employees. The Ralph M. Parsons Company, as exercising the duty of Hensel-Phelps to provide a safe place to work, not only shares that duty but shares also the immunity accorded to Hensel-Phelps by the Workmen's Compensation Act. [citing *Athas v. Hill*, 300 Md. 133, 148–9, 476 A.2d 710, 718 (1984)].

The reasoning of [*Athas v. Hill*] is as fully applicable to an independent contractor who "performs the nondelegable duty" as it is to an employee who performs the same. The independent contractor likewise "does not thereby assume a personal duty toward" the employees of the employer whose nondelegable duty it has assumed.

The Ralph M. Parsons Company, therefore, is immune from tort suit by these [appellants].

After hearing arguments, the circuit court (Pines, J.) granted the appellee's motion for summary judgment. The court concluded *sua sponte* that MTA was the decedent's "statutory employer," and that the appellee shared the MTA's statutory immunity under the Workmen's Compensation Act.[11] Accordingly, the present tort action was barred, and the appellants' exclusive remedy was under the Act. The court reasoned:

Though the massive court file generated by this case is difficult to handle physically, the central issue can be precisely identified and reduced to a narrow inquiry: "Can suit be maintained by plaintiffs against a third party (Parsons) based on Parsons' alleged failure to perform the statutory employer's (MTA) nondelegable duty to provide a safe workplace?" We think not—Parsons, who contracted with MTA to assist the statutory employer in performing the employer's non-delegable safe work-

---

11. Apparently, neither party argued before the circuit court that MTA was the "statutory employer" of the decedent.

place duty, is entitled to the same immunity as the employer.

Defendant Parsons is being sued for its alleged assumption and breach of MTA's duty to provide a safe workplace. The Court finds that the plaintiffs' cause of action against Parsons is barred because the remedy afforded the plaintiffs is contained within the Maryland Workmen's Act.[12]

Judgment was entered on December 12, 1985.

The appellants filed a Motion to Alter Judgment,[13] arguing, *inter alia*, that MTA was not the statutory employer of the decedent. On February 26, 1986, the motion was denied. Appellants appealed the lower court's decision to the Court of Special Appeals, and concurrently filed a petition for writ of certiorari with this Court. Before review by the intermediate appellate court, we granted the appellants' petition. We now reverse the judgment of the circuit court.

## II

### Scope of Review

A word is needed about our role in reviewing the circuit court's entry of summary judgment for the appellee. According to Md.Rule 2–501(e), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In determining whether any factual issues exist, the trial court must resolve all inferences against the moving party. *Honaker v. W.C. & A.N. Miller*

---

12. The circuit court reached its conclusion after considering the following cases: *Allen v. Employers Serv. Corp.,* 243 So.2d 454 (Fla. Dist.Ct.App.), *cert. denied,* 248 So.2d 167 (1971); *Wyatt v. Potomac Elec. Power Co.,* 64 Md.App. 614, 498 A.2d 278 (1985); *Athas v. Hill,* 300 Md. 133, 476 A.2d 710 (1984); *Donahue v. Maryland Casualty Co.,* 248 F.Supp. 588 (D.Md.1965), *aff'd,* 363 F.2d 442 (4th Cir.1966).

13. Md.Rule 2–534.

*Development Co.,* 285 Md. 216, 231–32, 401 A.2d 1013, 1020–21 (1979) (*Honaker II*). Our job in reviewing the grant of summary judgment is identical. We must also decide whether there is a genuine dispute as to any material fact, with inferences drawn in favor of the non-moving party, and whether the moving party is entitled to judgment as a matter of law. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 621, 495 A.2d 838, 839 (1985). *See King v. Bankerd,* 303 Md. 98, 110–12, 492 A.2d 608, 614–15 (1985); *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 8, 327 A.2d 502, 508–9 (1974).

## III

### Statutory Background

Our analysis begins with an examination of the Workmen's Compensation Act, which will bring the present controversy into focus and help clarify the opposing contentions. The Maryland Workmen's Compensation Act was enacted in 1914 to compensate employees who were injured in the course of their employment. The statute took the place of the common law tort system, which proved to be an inadequate means of compensating employees for their work-related injuries.[14] As we noted recently in *Johnson v. Mountaire Farms,* 305 Md. 246, 250, 503 A.2d 708, 710 (1986), the statute struck a delicate balance between workers and employers:

> Workers lost their right to sue their employers for negligence but gained the right to quick and certain compensation for injuries sustained during the course of their employment, regardless of fault. *See Wood v. Aetna Casualty & Surety Co.,* 260 Md. 651, 660–61, 273 A.2d 125, 131 (1971); *Victory Sparkler Co.* [*v. Francks,* ] 147 Md. [368, 376–77, 128 A. 635, 638 (1925).] In return,

---

**14.** For a concise history of the Workmen's Compensation Act, see *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 222–23, 401 A.2d 1013, 1016–17 (1979) (*Honaker II*); *Hubbard v. Livingston Fire Protection, Inc.,* 289 Md. 581, 587–88, 426 A.2d 901, 904–5 (1981).

employers lost their defenses of contributory negligence, assumption of risk, and fellow servant rule but gained the advantage of having their liability limited. *Wood, supra,* 260 Md. at 660–61, 273 A.2d at 131; *Victory Sparkler Co., supra,* 147 Md. at 376–77, 128 A. at 638; *see also* 2A. A. Larson, *The Law of Workmen's Compensation* § 65.11 (1983).

*Id.,* 503 A.2d at 710.

Maryland Code (1957, 1985 Repl.Vol.), Art. 101, § 15 sets forth the duties of employers under the Act. It provides in pertinent part:

> Every employer subject to the provisions of this article, shall pay or provide as required herein compensation according to the schedules of this article for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment without regard to fault as a cause of such injury, except where the injury is occasioned by willful intention of the injured employee to bring about the injury or death of himself or of another, or where the injury results solely from the intoxication of the injured employee while on duty or solely from the effect upon him of any narcotic, depressant, stimulant, hallucinogenic or hypnotic drug or from the effect upon him of any other drug which renders him incapable of satisfactorily performing his job except when such drug has been administered or taken in accordance with a physician's prescription.

> . . . . .

> The liability prescribed by the last preceding paragraph shall be exclusive, except that if an employer fails to secure the payment of compensation for his injured employees and their dependents as provided in this article, an injured employee or his legal representative in case death results from the injury, may, at his option, elect to claim compensation under this article, or to maintain an

action in the courts for damages on account of such injury....

Apart from several statutory exceptions, the liability of the employer is exclusive. *Id. See Lowery v. McCormick Asbestos Co.,* 300 Md. 28, 40–44, 475 A.2d 1168, 1174–76 (1984). That is, an injured employee may not maintain an action at law for damages against his employer. Since the worker's sole remedy against the employer is a claim under the Act, the employer is considered to be "immune" from suit at law.

Importantly, however, the injured employee may elect to proceed in an action at law against third parties. Md.Code (1957, 1985 Repl.Vol.), Art. 101, § 58 states in part:

Where injury or death for which compensation is payable under this article was caused under circumstances creating a legal liability in some person other than the employer to pay damages in respect thereof, the employee, or in the case of death, his personal representative or dependents as hereinbefore defined, may proceed either by law against that other person to recover damages or against the employer for compensation under this article, or in case of joint tort-feasors against both; and if compensation is claimed and awarded or paid under this article, any employer, if he is self-insured, insurance company, association, the State Accident Fund, the Subsequent Injury Fund, or the Uninsured Employers' Fund, may enforce for their benefit, as the case may be, the liability of such other person; provided, however, if damages are recovered in excess of the compensation already paid or awarded to be paid under this article, and also any payments made for medical or surgical services, funeral expenses or for any of the other purposes enumerated in § 36 of this article, then any such excess shall be paid to the injured employee, or in case of death to his dependents less the expenses and costs of action incurred by the employer, insurance company, association, State Accident Fund, the Subsequent Injury Fund, or the Uninsured Employers' Fund, as the case may be.

As the foregoing discussion suggests, the application of section 15 statutory immunity will depend greatly upon who is considered an "employer" under the Act. The term "employer" is defined broadly in the statute as "those persons who fall within the requirements of § 21(a) of this article including a person, partnership, association, corporation, and the legal representative of a deceased employee, or the receiver or trustee of a person, partnership, association or corporation employing workmen." Md.Code (1957, 1985 Repl.Vol.), Art. 101, § 67(2). Section 21(a) provides that "employers" include "every person that has in the State one or more employees subject to this act" and "[t]he State, any agency thereof, and each county, city, town, township, incorporated village, school district, sewer district, drainage district, public or quasi-public institution, or any other political subdivision of the State that has one or more employees subject to this act."

 The words "employer" and "employee" in the statute are equivalent to and synonymous with the words "master" and "servant." *Edith A. Anderson Nursing Homes, Inc. v. Walker*, 232 Md. 442, 444, 194 A.2d 85, 86 (1963). Therefore, the test for determining the existence of an employer and employee relationship under the Act is the same as the common law rules for ascertaining the relation of master and servant. *Id.*, 194 A.2d at 86. That test inquires whether the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done. *Mackall v. Zayre Corp.*, 293 Md. 221, 230, 443 A.2d 98, 103 (1982). In administering this test, we have established five criteria to consult for guidance. These include: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer. *Id.*, 443 A.2d at 103.

Md.Code (1957, 1985 Repl.Vol.), Art. 101, § 62 significantly broadened the definition of "employer" under the Act.

Included two years after the Act's passage in 1914, the provision states in pertinent part:

When any person as a principal contractor, undertakes to execute any work which is a part of his trade, business or occupation which he has contracted to perform and contracts with any other person as subcontractor, for the execution by or under the subcontractor, of the whole or any part of the work undertaken by the principal contractor, the principal contractor shall be liable to pay to any workman employed in the execution of the work any compensation under this article which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal contractor, then, in the application of this article, reference to the principal contractor shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the workman under the employer by whom he is immediately employed.[15]

In *State v. Bennett Building Co.*, 154 Md. 159, 162, 140 A. 52, 53 (1928), we summarized the impact of this provision:

The effect of this provision, when brought into operation through the designated state of circumstances, is to impose the absolute liability of an employer upon the principal contractor, when he was not in law the employer of the injured workman. The result then is that where the

---

15. Section 62 further provides:

Where the principal contractor is liable to pay compensation under this section, he shall be entitled to indemnity from any employer, who would have been liable to pay compensation to the employee independently of this section, and shall have a cause of action therefor against such employer.

Nothing in this section shall be construed as preventing a workman from recovering compensation under this article from the subcontractor instead of from the contractor.

Whenever an employee of a subcontractor files a claim under this article against the principal contractor, the principal contractor shall have the right to join the subcontractor or any intermediate contractors as defendant or codefendant in the case.

prescribed conditions exist, the principal contractor becomes by the act the statutory employer of any workman employed in the execution of the work.

It is common to speak of the principal contractor's liability as that of the "statutory employer" to a "statutory employee." *Honaker v. W.C. & A.N. Miller Development Co.*, 278 Md. 453, 456, 365 A.2d 287, 289 (1976) (*Honaker I*); 1C A. Larson, *The Law of Workmen's Compensation* § 49.13 (1986).[16]

Our predecessors in *Bennett Building* noted the purpose of section 62. Despite the length of that analysis, it bears repeating in full:

> It is common practice in certain trades for one party to agree for a reward to complete a certain work or undertaking, and then to enter into subcontracts with various parties providing for the execution by them respectively of specified parts of the whole work or undertaking, so that the whole or part thereof would be done by such subcontractors and their assistants. In this manner the principal contractor would avoid in part the responsibility for accidents happening in the carrying out of the work or undertaking. If this responsibility were so shifted upon parties too weak financially to meet it, and who had not secured compensation to their employees in one of the ways required by the statute, an injured workman, proceeding at common law or under the Workmen's Compensation Act, would obtain neither compensation nor damages. Furthermore, difficult questions arose with reference to whether the workman was the servant of the principal contractor rather than of his immediate employer, depending largely upon who had power to hire and

---

**16.** In *Bennett Building,* 154 Md. at 165, 140 A. at 54, we said:

> It may be said that there were two employers of the dead man. One was his immediate employer, the subcontractor, whose relationship was founded in contract; and the second was his more remote statutory employer, the principal contractor, whose status, with the rights and liabilities growing thereout, was created and determined by law.

discharge, to direct and control the workmen, and a variety of other circumstances. In order to obviate these contingencies, and more certainly to assure the workman his contemplated compensation, the statute has imposed, under a certain state of circumstances, a liability to pay upon the principal contractor, although he might not have been held at common law the employer of the injured workman.

*Bennett Building,* 154 Md. at 161–62, 140 A. at 53. *See Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 19, 155 A.2d 691, 696 (1959).

■ Like the employer under section 15, a "statutory employer" under section 62 is not amenable to suit at law under the third party provision of section 58. *Bennett Building,* 154 Md. at 166, 140 A. at 55 (statutory employer is not a "person other than the employer" within the meaning of section 58). The "statutory employer" is thus immune from suit and the injured worker's exclusive remedy against this statutory creature is under the Workmen's Compensation Act. *See State v. City of Baltimore,* 199 Md. 289, 86 A.2d 618 (1952).

With this statutory scheme in mind, we now turn to the ruling of the circuit court that the appellee enjoys immunity from the present tort action under the Act.

## IV

### Ruling of the Circuit Court

The circuit court advances a two step argument. First, the court asserts that the MTA, the owner of the Cold Spring Lane Station, is the "statutory employer" of the decedent under section 62 and thus is immune from suit at law. The court then seeks to cloak the appellee in that blanket of immunity by invoking our recent decision in *Athas v. Hill,* 300 Md. 133, 476 A.2d 710 (1984). In *Athas,* we held that an employee could not sue a supervisory co-employee under section 58 (third party liability) for failure to provide a safe workplace and for failure to retain

competent nonviolent employees. Since such responsibilities were non-delegable duties of the employer, the supervisory co-employee did not assume a personal duty toward the injured worker. From this holding, the circuit court implicitly concluded that *Athas's* discussion of a "supervisory employee" should be extended to an independent contractor performing the statutory employer's (in this case, MTA's) duty to provide a safe workplace.[17]

All of the above discussion presupposes that the various conditions for establishing the status of a "statutory employer" have been met. As the following discussion indicates, this first hurdle has not been overcome.

## V

### Requirements for "Statutory Employer" Status

We have had occasion to discuss in some detail the requirements for qualifying as a "statutory employer." In *Honaker I,* we stated that a "statutory employer" is:

1) a principal contractor [18]

2) who has contracted to perform work

3) which is part of his trade, business or occupation; and

4) who has contracted with another party as a subcontractor for the execution by or under the subcontractor of the whole or any part of such work.[19]

---

**17.** In the context of a motion for summary judgment, the appellee, the moving party, will be entitled to judgment as a matter of law if it is determined that 1) MTA is the "statutory employer" of the decedent and thus immune under the Act; and 2) the appellee was performing MTA's non-delegable duty of providing a safe work site, thereby not assuming a personal duty toward the decedent.

**18.** The term "principal contractor" is not limited to a general contractor, but can include an intermediate contractor. *See Kegley v. Vulcan Rail & Constr. Co.,* 203 Md. 476, 101 A.2d 822 (1954). *See also Honaker I,* 278 Md. at 460 n. 4, 365 A.2d at 291 n. 4.

**19.** The term "by or under the subcontractor" indicates that the statutory liability of the principal contractor is not limited solely to employees of the subcontractor, but can also include employees of a

*Honaker I,* 278 Md. at 460, 365 A.2d at 291. *Accord, Honaker II,* 285 Md. at 225, 401 A.2d at 1017–18; *Coffey v. Derby Steel Co.,* 291 Md. 241, 251, 434 A.2d 564, 569 (1981). Elaborating on this scheme, we have noted that the statute requires two contracts. The first contract is between "the principal contractor and a third party whereby it is agreed that the principal contractor will execute certain work for a third party." *Honaker I,* 278 Md. at 460, 365 A.2d at 291. This has been referred to as an "antecedent undertaking" or "principal contract." *See Warren v. Dorsey Enterprises, Inc.,* 234 Md. 574, 579, 200 A.2d 76, 78 (1964).[20] The second contract is between the "principal contractor and a person as subcontractor whereby the subcontractor agrees to do the whole or part of such work" that the principal contractor agreed to perform for the third party. *Honaker I,* 278 Md. at 460, 365 A.2d at 291. The work covered by the second contract (i.e., subcontract) must be work which is a part of the principal contractor's trade, business or occupation. *See Warren,* 234 Md. at 578, 200 A.2d at 78. *See*

---

sub-subcontractor who have no contractual relationship with the principal contractor. *See State v. City of Baltimore,* 199 Md. 289, 86 A.2d 618 (1952); *Palumbo v. Nello L. Teer Co.,* 240 F.Supp. 226, 232 (D.Md.1965).

**20.** It follows from this requirement—that there must be an antecedent contract between a principal contractor and third party—that property owners cannot be "principal contractors" and thus "statutory employers" within the meaning of section 62, except in those situations where the owner also serves as a contractor for yet another entity. *See, e.g., Manning v. Georgia Power Co.,* 252 Ga. 404, 314 S.E.2d 432 (1984); *Cadillac Fairview of Florida, Inc. v. Cespedes,* 468 So.2d 417 (Fla.Dist.Ct.App.), *petition for rev. denied,* 479 So.2d 117 (1985). *Cf. Honaker I,* 278 Md. at 463, 365 A.2d at 293 (inferring, but not deciding, that an owner cannot be a "principal contractor" without having contracted with a third party). For a discussion of whether an owner can be a "statutory employer," see 1C A. Larson, *The Law of Workmen's Compensation* § 49.13 (1986).

*also Coffey*, 291 Md. at 251–56, 434 A.2d at 570–72; *Honaker II*, 285 Md. at 229–32, 401 A.2d at 1019–20.[21]

Summarizing section 62 in *Bennett Building*, we noted:

Although acting independently of the other, the principal contractor and the subcontractor, with his workmen employed in the execution of the work, were each, in his own separate capacity, co-operating toward the execution of the whole of a particular work which the principal contractor had promised to perform [for a third party].

*Bennett Building*, 154 Md. at 166, 140 A. at 54–5. *See Long Co. v. State Accident Fund*, 156 Md. 639, 645, 144 A. 775, 778 (1929) ("to create the principal contractor a statutory employer he must have contracted in the first instance to do the work himself, and subsequently sublet the whole or a portion of it to someone else").

## VI

### MTA as "Statutory Employer"

■ Our application of the foregoing principles leads us to conclude that MTA is *not* a "statutory employer" under the Workmen's Compensation Act. MTA cannot be considered a principal contractor because it never entered into a principal or antecedent contract with a third party. Borrowing words of our predecessors, MTA never "contracted in the first instance to do the work" itself. *See Long Co.*, 156 Md. at 647, 144 A. at 778.[22]

---

**21.** In *Roland*, 221 Md. at 19, 155 A.2d at 696 (citation omitted), we noted:

This [requirement] seems to reflect the general purpose of the whole Section—to assure the protection to workers which the Act was intended to afford—by forestalling evasion of the Act by any employers who might seek to avoid its obligations by subdividing their operations through subcontracts.

**22.** Appellee asserted during oral argument (but not in its brief) that the Urban Mass Transportation Capital Grant Contract between the Maryland Department of Transportation (and the MTA as grantee under the contract) and the United States is the requisite antecedent contract. However, the record does not contain the Capital Grant Contract, and the appellee has not quoted from its provisions. In fact,

Since MTA did not promise to perform any work, it follows that it could not have entered into a second contract with a subcontractor, whereby the latter party agreed to perform work which MTA had promised to undertake. It is true that MTA contracted with Hensel-Phelps to build the Cold Spring Lane Station. However, MTA's agreement with Hensel-Phelps is not a "subcontract" within the meaning of section 62. For a subcontract to arise, there must be a "contract that assigns some of the obligations of a prior contract to another party." *Honaker I,* 278 Md. at 461, 365 A.2d at 292.[23] There being no prior contract from which obligations could be assigned, a subcontract was absent.

In *Honaker I,* we were confronted with an analogous situation. In that case, the W.C. & A.N. Miller Development Company (Miller), which builds and sells houses, was erecting a house on property it owned in Montgomery County. It entered into a contract with Orndorff and Spaid, Inc. (Orndorff) for that company to furnish all labor and

---

it was never offered in evidence below. Md.Rule 828 b 1 states in part:

> "The printed extract shall contain such parts of the record as may reasonably be necessary for the determination of the questions presented by the appeal."

We will not consider matters which have not been presented in compliance with this rule. *State Highway Admin. v. Transamerica Ins. Co.,* 278 Md. 690, 702, 367 A.2d 509, 517 (1976) (and cases cited therein); *Lustine v. State Roads Comm'n,* 217 Md. 274, 278, 142 A.2d 566 (1958). We must deal with cases as they are brought before us by the record transmitted from the court below. Therefore, we will not pass on appellee's contention because we simply have no knowledge of what the contract contained. *See Transamerica,* 278 Md. at 702–3, 367 A.2d at 517.

We note parenthetically, however, that a mere financing agreement, which grants funds for a construction project, between an owner or contractor and a third party will not give rise to an antecedent contract unless the agreement also requires that the owner or contractor perform work or services for the third party. *See Sheedy v. Vista Properties, Inc.,* 410 So.2d 561, 563–4 (Fla.Dist.Ct.App.), *petition for rev. denied,* 419 So.2d 1201 (Fla.1982).

**23.** Subcontractor is defined as "an individual or business firm that contracts to perform part or all of another's contract." *Honaker I,* 278 Md. at 463, 365 A.2d at 292.

material to install a roof on the house, gutters and down-spouts, and a fireproof garage door. Honaker, the appellant, was an employee of Orndorff. While working on the installation of the roof, Honaker sustained an accidental personal injury, alleged to be due to Miller's negligence. After receiving workmen's compensation benefits, Honaker and his wife filed a tort action in the circuit court against Miller. Among other documents, Miller filed a motion for summary judgment, arguing that it was the statutory employer of Honaker and that appellant's exclusive remedy was under the Act. The circuit court agreed with Miller and granted its motion for summary judgment.

Reversing the circuit court, we concluded that Miller was not a "statutory employer" under the Act. There was no antecedent contract on Miller's part to perform work for a third party. We said:

> What is missing in the case *sub judice* is a contract on the part of Miller to build the house. It is true that Miller contracted with Orndorff for Orndorff to install the roof, but that work was not part of any work which Miller had, in the words of the statute, "contracted to perform." Thus, the contract between Miller and Orndorff was not a subcontract. The contract did not assign to Orndorff some of the obligations of another contract; it was not an agreement to perform a specified part or provide specified materials required for the completion of another contract; it was not a contract under or subordinate to a previous or prime contract. As Miller did not owe labor or services under another contract for the work Orndorff agreed to execute, Miller was not "a principal contractor" and Orndorff was not "a subcontractor" with respect to the contract between them. Because the conditions prescribed by the statute did not exist, Miller did not become the statutory employer of Honaker.

*Id.* at 463, 365 A.2d at 293.

On remand, the supplemented record revealed a "custom building contract" between Miller and a third party, for whom the house was being built. However, the circuit

court denied Miller's renewed motion for summary judgment. The Court of Special Appeals reversed, and in *Honaker II* we affirmed. Miller was indeed a statutory employer, because an antecedent contract had been shown. Honaker's employer, in his own separate capacity, was cooperating with Miller toward the execution of the whole of a particular work, which Miller had promised to perform under a principal contract with a third party. *Honaker II,* 285 Md. at 216, 401 A.2d at 1019.

We conclude that MTA is not the "statutory employer" of the decedent under section 62 of the Act.[24] Since MTA cannot invoke the immunity of section 15, the appellee cannot seek to cloak itself under that protection vis-a-vis our holding in *Athas.* Appellee stands in no different position than any third party liable to suit at law under section 58. Accordingly, the appellee was not entitled to judgment as a matter of law, and the circuit court's entry of summary judgment was improper.

### VII

In a further effort to sustain the judgment below, the appellee advances two additional arguments. First, appellee asserts that it is immune from suit because it was performing the nondelegable duty of the decedent's employer, Rocky Mountain, to provide a safe workplace (citing *Athas* and related cases). Appellee's reliance on *Athas* is misplaced. The appellee is an independent contractor. In *Athas,* we limited our holding to supervisory coemployees.

---

**24.** The true "statutory employer" in this case is Hensel-Phelps. Hensel-Phelps became the principal contractor by entering into an antecedent contract with MTA, a third party, to build the Cold Spring Lane Station. Hensel-Phelps, in turn, subcontracted a portion of its contractual duties under the antecedent contract to the decedent's employer, Rocky Mountain. The subcontracted work—sheet metal construction—is part of Hensel-Phelps' trade, business or occupation. In short, Hensel-Phelps is the "statutory employer" of the decedent because Hensel-Phelps contracted with a third party in the first instance to do the work itself, and subsequently sublet a portion of it to someone else.

We said: "Our opinion today is limited to cases arising under similar facts and circumstances." *Athas*, 300 Md. at 150, 476 A.2d at 719. Unlike the coemployee in *Athas*, the appellee has undertaken independent safety responsibilities pursuant to its contract with MTA.

■ Secondly, appellee contends that it was acting as an agent of MTA within the meaning of Md.Code (1977, 1986 Cum.Supp.), Transportation Article, § 7–702, which states (emphasis added):

(a) *Administration liable for contracts and torts.* —Subject to subsection (b) of this section, the [Mass Transit] Administration is liable for its contracts and torts and for the torts of its officers, *agents*, and employees in connection with the performance of the duties and functions of the Administration under this title.

(b) *Exclusive remedy is suit.*—The exclusive remedy for a breach of contract or for a tort committed by the Administration, its officers, *agents*, or employees is a suit against the Administration. No execution may be levied on any property of this State or of the Administration.

As an agent, appellee contends, it is immune from suit and the appellants' sole remedy is an action against the MTA. For the reasons stated below, this contention must also fail.

The legislature has not defined the term "agent" in the statute. Our task then in construing this term is to ascertain and effectuate the actual legislative intent. *Tucker v. Fireman's Fund Insurance Co.*, 308 Md. 69, 73, 517 A.2d 730, 731 (1986) (and cases cited therein). Since an undefined term should ordinarily be given its usual and natural meaning, *id.*, 517 A.2d at 731–32, we will consult well recognized principles of agency law for guidance.

According to the Restatement (Second) of Agency (1958), agency is a legal relationship created "as the result of conduct by two parties manifesting that one of them [the principal] is willing for the other [the agent] to act for him subject to his control, and that the other consents so to act." Restatement (Second) of Agency § 1 comment a (1958).

Agency is a broad concept, covering two different species of relationships. The first, and most common, is the master-servant relationship. As we noted earlier, this relationship exists when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done. *Mackall*, 293 Md. at 230, 443 A.2d at 103. *See B.P. Oil Corp. v. Mabe*, 279 Md. 632, 637, 370 A.2d 554, 557–58 (1977).[25]

An agent who does not meet the definition of a servant is an independent contractor. Restatement (Second) of Agency §§ 2 comment b, 14N comment a.[26] That is, an agent who is not subject to the control of, or the right of control of, the principal with respect to his physical conduct in the performance of services is an independent contractor.[27] *Id.*

---

25. The factors used to determine if a master-servant relationship exists have been discussed earlier, and need not be restated here. We do note, however, that the key factor, with conclusive significance, is the power or right of control. *See Whitehead v. Safeway Steel Prods.*, 304 Md. 67, 78, 497 A.2d 803, 809 (1985) (and cases cited therein). When this factor is absent, the master-servant relationship has not been established.

26. We emphasize that the following discussion is concerned with independent contractors who are considered to be agents. Not all independent contractors are agents. *See* Restatement (Second) of Agency §§ 2 comment b, 14N comment b. "A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent independent contractor." *Id.* at § 14N comment b.
 "Thus, one who contracts for a stipulated price to build a house for another and who reserves direction over the conduct of the work is an independent contractor; but he is not an agent, since he is not a fiduciary, has no power to make the one employing him a party to the transaction, and is subject to no control over his conduct."
 *Id.* at § 2 comment b.

27. Independent contractors generally considered to be agents include attorneys, auctioneers, brokers, factors, and other similar persons who conduct transactions for their principal. *Henley v. Prince George's County*, 305 Md. 320, 340 n. 5, 503 A.2d 1333, 1343 n. 5 (1986) (citing Seavey, *Handbook on the Law of Agency* § 6, at 8 (1964)).

at § 14N comment a. *See Greer Lines Co. v. Roberts,* 216 Md. 69, 82, 139 A.2d 235, 240 (1958).[28]

> "However, [independent contractors] fall within the category of agents. They are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience."

Restatement (Second) of Agency § 14N comment a.

Another way to distinguish servants from independent contractors is to say that the servant "is one within the personal or business household of the principal, whereas the non-servant is on the outside." *Id.* at p. 479, Introductory Note on Torts of Servants.

> "The servant is, thus an integral part of the master's establishment; the non-servant aids in the business enterprise but is not a part of it. Because the servant is an internal element of the establishment, it is normal for the head of the enterprise to control his physical acts and also the time when he is to act for the enterprise. Primarily, the servant sells his personal services, submitting to control as to his physical activities and the use of his time. The non-servant agent agrees sometimes to render services and sometimes to achieve results, but he does not surrender control over his physical actions."

*Id.*

The importance of the distinction between a servant and an independent contractor concerns the applicability of the doctrine of *respondeat superior.* This doctrine holds an employer (master) vicariously liable for the tortious conduct of an employee (servant) when the employee is acting within the scope of the employment relationship. *Dhanraj v. Potomac Electric Power Co.,* 305 Md. 623, 627, 506 A.2d 224, 226 (1986). As we noted in *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 580, 119 A.2d 423, 427 (1956):

---

**28.** For a scholarly discussion of these agency principles, see Judge Wilner's opinion for the Court of Special Appeals in *Sanders v. Rowen,* 61 Md.App. 40, 484 A.2d 1023 (1984).

"[A] master is liable for the acts which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all the material facts."

The doctrine of *respondeat superior* does not ordinarily apply to the independent contractor relationship. *See, e.g., Hoerr v. Hanline*, 219 Md. 413, 420, 149 A.2d 378, 381 (1959). *Accord Rubin v. Weissman*, 59 Md.App. 392, 404, 475 A.2d 1235, 1241 (1984).

We turn again to the statutory provision on which the appellee relies. By using such terms as "employees" and "officers," which are traditionally considered to be servants of a principal,[29] we believe the legislature intended the term "agent" to be given a similar construction. Stated differently, only those parties who meet the definition of a servant will be considered an "agent" under section 7–702. Our construction necessarily excludes agents who are independent contractors from the ambit of this provision.

■■■ The question then is whether the appellee has met the definition of a servant under the foregoing principles. We note in this regard that the burden of proving that one is a servant is on the party asserting that status for his own benefit. *Cox v. Prince George's County*, 296 Md. 162, 169, 460 A.2d 1038, 1042 (1983); *Globe Indemnity*, 208 Md. at 584, 119 A.2d at 429.

We cannot conclude on this record that the appellee is a servant. The element of control is lacking. Significantly, the appellee is not within the "business household" of MTA. The appellee is a separate, distinct business, which has not surrendered control over its operations or the conduct of its employees. The responsibility to supervise, control, and direct the performance of its own personnel in fulfilling the

---

**29.** "The word 'employee' is commonly used in current statutes to indicate the type of person ... described as servant." Restatement (Second) of Agency § 2 comment d.

contract's requirements remained with appellee throughout the project.

Appellee counters that it is "required to make periodic reports to MTA," and to "consult with MTA about numerous phases of its work." As to the former requirement, we have held that "the mere rendition of reports to an employer does not establish that the employee is under such control as to make him a servant." *Globe Indemnity*, 208 Md. at 584, 119 A.2d at 428–29. As to the consultation issue, an employer does not transform an independent contractor into a servant merely because he wishes to supervise the project as it transpires. The employer still retains an interest in the final result, and general supervisory actions in that regard do not create a servant.

> "[T]he fact that an employer reserves the right to supervise the work of an employee merely for the purposes of determining whether it is being done in accordance with the contract does not preclude the relationship of independent contractor."

*Id.*, 119 A.2d at 429 (citation omitted).

Appellee further contends that there are numerous acts that it must perform when requested by MTA. However, the control over such requests and the responsibility for the manner in which they would be carried out were in the hands of the appellee and its supervisors or employees.[30]

In short, the best that can be said is that MTA "anticipated a completed result," *Greer*, 216 Md. at 82, 139 A.2d at 241, but had no right to supervise and control appellee's work. Accordingly, the appellee is not an "agent" within the meaning of section 7–702.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FUR-

---

**30.** Appellee relies on *Johnson v. Bechtel Assoc. Prof. Corp.*, 717 F.2d 574 (D.C.Cir.1983), *reversed on other grounds sub nom. Washington Metropolitan Area Transit Authority v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). We do not find *Bechtel* persuasive.

THER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.