846 A.2d 1048

**Joao RODRIGUES–NOVO, et al.**

v.

**RECCHI AMERICA, INC., et al.**

**No. 11, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 14, 2004.

Jeffrey Fenster (Stein, Sperling, Bennett, DeJong, Driscoll & Greenfeig, P.C., on brief), Rockville, for appellants.

Andrew Butz (Carolyn Israel Stein and Keith M. Bonner of Bonner Kiernan Trebach & Crociata, on brief), Washington, D.C., for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

BATTAGLIA, J.

We have been asked in this case to determine whether, under the provisions of the Maryland Workers' Compensation Act, the Washington Metropolitan Transportation Authority (hereinafter "WMATA") was a "statutory employer" of Joao Rodrigues–Novo and, thus, immune from tort liability. This case comes to us by a Certified Question from the District of Columbia Court of Appeals, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code, §§ 12–601 through 12–613 of the Courts and Judicial Proceedings Article (1974, 2002 Repl.Vol.),[1] and Maryland Rule

---

1. Section 12–603 of the Courts and Judicial Proceedings Article states:

8–305.[2] In the Certification Order, the District of Columbia Court of Appeals summarized the circumstances giving rise to the question now before us:

> Appellant Joao Rodrigues–Novo was injured in a construction accident while working at the Branch Avenue Metro Station in Prince George's County, Maryland. At the time of the accident, Rodrigues–Novo was employed by Pessoa Construction, Inc. ("Pessoa"). Pessoa was a subcontractor of appellee Recchi America, Inc. ("Recchi"). Recchi, in

---

The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

2. Maryland Rule 8–305 states:
(a) Certifying court. "Certifying court" as used in this Rule means a court authorized by Code, Courts Article, § 12–603 to certify a question of law to the Court of Appeals of Maryland.
(b) Certification order. In disposing of an action pending before it, a certifying court, on motion of any party or on its own initiative, may submit to the Court of Appeals a question of law of this State, in accordance with the Maryland Uniform Certification of Questions of Law Act, by filing a certification order. The certification order shall be signed by a judge of the certifying court and state the question of law submitted, the relevant facts from which the question arises, and the party who shall be treated as the appellant in the certification procedure. The original order and seven copies shall be forwarded to the Court of Appeals by the clerk of the certifying court under its official seal, together with the filing fee for docketing regular appeals, payable to the Clerk of the Court of Appeals.
(c) Proceeding in the Court of Appeals. The filing of the certification order in the Court of Appeals shall be the equivalent of the transmission of a record on appeal. The Court of Appeals may request, in addition, all or any part of the record before the certifying court. Upon request, the certifying court shall file the original or a copy of the parts of the record requested together with a certificate, under the official seal of the certifying court and signed by a judge or clerk of that court, stating that the materials submitted are all the parts of the record requested by the Court of Appeals.
(d) Decision by the Court of Appeals. The written opinion of the Court of Appeals stating the law governing the question certified shall be sent by the Clerk of the Court of Appeals to the certifying court. The Clerk of the Court of Appeals shall certify, under seal of the Court, that the opinion is in response to the question of law of this State submitted by the certifying court.

turn, was a contractor working for the Washington Metropolitan Area Transportation Authority ("WMATA"), which owned the site.

Appellant Rodrigues–Novo and his wife filed suit in the District of Columbia Superior Court against Recchi [and] WMATA . . . alleging negligence in the supervision, maintenance, and inspection of the loader and construction site, which negligence they claimed caused their damages. The trial court granted summary judgment to both defendants, on the ground that under the Maryland law of workers' compensation they were "statutory employers" and hence immune from suit. An appeal has been taken to [the District of Columbia Court of Appeals] challenging that conclusion.

The answer to this question of law will be determinative of th[e] appeal and it appears to [the District of Columbia Court of Appeals] that as to WMATA, there is no controlling appellate decision, constitutional provision or statute in Maryland. Furthermore, the issue is one of general importance, given the extensive ongoing activities of WMATA in Maryland. Accordingly, pursuant to D.C.Code § 11–723(h) (2001), the Maryland Uniform Certification of Questions of Law Act, Md.Code Ann., Cts. & Jud. Proc. § 12–601 et seq. (2002 Repl.), and Rule 8–305 of the Maryland Court of Appeals, we hereby respectfully certify to the Maryland Court of Appeals the following question of law: Whether, in the circumstances of this case, WMATA was a "statutory employer" under the Maryland Workers' Compensation Act and hence immune from suit alleging negligence.[3] (Footnotes omitted.)

---

**3.** Rodrigues–Novo asserts that certain statements in the Certifying Order reflect the Certifying Court's "findings" as to WMATA's status as a statutory employer. The Certifying Court's *uncertainty* about WMATA's status as a statutory employer, however, is the reason it decided to certify the question in this case. It should be obvious that any statements made in the Certifying Order should not be construed to suggest a particular answer to the very question being asked.

For the following reasons, we hold that, under the Maryland Workers' Compensation Act, WMATA was a "statutory employer" of Rodrigues–Novo at the time of his injury. Therefore, WMATA is immune from Rodrigues–Novo's claim of negligence.

## I. Background

### A. Facts

On July 15, 1999, Rodrigues–Novo was working on the construction project at the Branch Avenue Metro Station in Prince George's County, Maryland. While using a Toyota SDK–8 Loader to break up a driveway that had been built incorrectly, Rodrigues–Novo sustained a serious injury leading to the loss of his lower right leg. At the time of the accident, WMATA had a contract relationship with Recchi, in which Recchi had agreed to construct an extension of WMATA's subterranean "Green Line," including the Branch Avenue Station. To complete the work, Recchi had entered into a subcontract with Pessoa, which promised to complete certain road construction and other concrete work at the Station. Rodrigues–Novo worked for Pessoa.

Shortly after his injury, Rodrigues–Novo applied for workers' compensation benefits under the Maryland Workers' Compensation Act. When WMATA's workers' compensation insurer, Lumberman's Mutual Casualty Co., learned of Rodrigues–Novo's application, it notified the Maryland Workers' Compensation Commission that WMATA's "wrap-up" workers' compensation insurance policy[4] covered the claim. The

---

4. WMATA has not always had insurance coverage for the workers' compensation claims of its subcontractors' employees. Prior to 1971, during the first phase of construction of Washington's rapid transit system (Metro), WMATA "relied upon its subcontractors to purchase workers' compensation insurance for subcontractor employees." *WMATA v. Johnson*, 467 U.S. 925, 928, 104 S.Ct. 2827, 2830, 81 L.Ed.2d 768, 774 (1984). When the second phase of construction commenced, WMATA decided to centralize its workers' compensation insurance in order to save money and ensure the coverage of all employees on its projects. *Id.* To do this, WMATA purchased "a comprehensive 'wrap-up' policy from the Lumberman's Mutual Casual-

wrap-up insurance carried by WMATA provides compensation benefits for all workers on Metro construction projects, including those who are employed by companies that contract with WMATA to carry out work on those projects. *See WMATA v. Johnson,* 467 U.S. 925, 929–30, 104 S.Ct. 2827, 2830, 81 L.Ed.2d 768, 774 (1984) (discussing the origin and purpose of WMATA's wrap-up workers' compensation insurance). Rodrigues–Novo has received some benefits from WMATA's wrap-up insurance coverage.[5]

### B. The Maryland Workers' Compensation Act

■ The Maryland Workers' Compensation Act (hereinafter the "Act"), which is currently codified under Maryland Code, Sections 9–101 to 9–1201 of the Labor and Employment Article (1991, 1999 Repl.Vol.), was first enacted in 1914, as its title suggests, to compensate employees who were injured on the job. *Harris v. Board of Education of Howard County,* 375 Md. 21, 28–29, 825 A.2d 365, 370 (2003); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 278 Md. 453, 454, 365 A.2d 287, 288 (1976) (hereinafter *"Honaker I"*); *see also Brady v. Ralph Parsons Co.,* 308 Md. 486, 496, 520 A.2d 717, 723 (1987); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 222–23, 401 A.2d 1013, 1016–17 (1979) (hereinafter *"Honaker II"*). The Act was designed as a delicate balance: on one hand, the Act took away employees' rights to sue employers for negligence, yet, on the other hand, it ensured employees the "right to quick and certain compensation for injuries sustained during the course of their employment, regardless of fault." *Brady,* 308 Md. at 496, 520 A.2d at 723 (quoting *Johnson v. Mountaire Farms,* 305 Md. 246, 250, 503 A.2d 708, 710 (1986)).

---

ty Co.," which required a single premium from WMATA in return for "compensation payments for any injuries suffered by workers employed at Metro construction sites and compensable under the relevant workers' compensation regimes." *Id.* at 929, 104 S.Ct. at 2830, 81 L.Ed.2d at 774.

**5.** According to his deposition testimony, Rodrigues–Novo received from workers' compensation insurance $2800 to convert the transmission in his truck from manual to automatic.

 Accordingly, with exceptions not relevant here, the Act provides the "exclusive" remedy for an injured employee against his or her employer, as set forth in Section 9–509 of the Act:

(a) *Employers.*—Except as otherwise provided in this title, the liability of an employer under this title is exclusive.

(b) *Covered employees and dependents.*—Except as otherwise provided in this title, the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person.

Whether an employee-employer relationship exists in the context of workers' compensation depends typically on the common law rules of the "master" and "servant" relationship. *See Brady,* 308 Md. at 499, 520 A.2d at 724 (citing *Edith A. Anderson Nursing Homes, Inc. v. Walker,* 232 Md. 442, 444, 194 A.2d 85, 85–86 (1963)).

 When certain conditions are met, however, the Act broadens the definition of employer to cover principal contractors that ordinarily would not be considered the worker's employer under the common law rules of "master" and "servant." *See Brady,* 308 Md. at 499–500, 520 A.2d at 724. To that end, Section 9–508(a) of the Act states:

(a) *In general.*—A principal contractor is liable to pay to a covered employee or the dependents of the covered employee any compensation that the principal contractor would have been liable to pay had the covered employee been employed directly by the principal contractor if:

(1) the principal contractor undertakes to perform any work that is part of the business, occupation, or trade of the principal contractor;

(2) the principal contractor contracts with a subcontractor for the execution by or under the subcontractor of all or part of the work undertaken by the principal contractor; and

(3) the covered employee is employed in the execution of that work.

We used the term "statutory employer" in *State, to Use of Hubert v. Bennett Building Co.,* 154 Md. 159, 162, 140 A. 52, 53 (1928) to describe the impact of these provisions:

> The effect of this provision, when brought into operation through the designated state of circumstances, is to impose the absolute liability of an employer upon the principal contractor, when he was not in law the employer of the injured workman. The result then is that where the prescribed conditions exist, the principal contractor becomes by the act the statutory employer of any workman employed in the execution of the work.

Therefore, an injured worker's exclusive remedy against a principal contractor is the compensation available under the Act. *See Para v. Richards Group of Washington L.P.,* 339 Md. 241, 253–54, 661 A.2d 737, 744 (1995) ("In return for providing workers' compensation coverage, the principal contractor is immune from civil liability for injuries suffered by covered employees."); *Brady,* 308 Md. at 502, 520 A.2d at 726 (stating that "the injured worker's exclusive remedy against [a statutory employer] is under the [Act]").

█ Principal contractors who do not meet the requirements of Section 9–508 are not "employers" and, as a result, do not benefit from the tort immunity created by the Act. Controversies over whether a principal contractor meets the requirements of Section 9–508, therefore, commonly arise when an injured worker seeks to bring a claim for negligence against a principal contractor rather than seek compensation under the Act. *See* RICHARD P. GILBERT & ROBERT L. HUMPHREYS, MARYLAND WORKERS' COMPENSATION HANDBOOK § 3.3–1 (2d. ed.1993).

█ In order to determine whether one qualifies as a statutory employer under the Act, this Court has separated the requirements of Section 9–508 into four elements. As we first expressed in *Honaker I,* the entity seeking tort immunity must be:

(1) a principal contractor

(2) who has contracted to perform work

(3) which is a part of his trade, business or occupation; and

(4) who has contracted with any other party as a subcontractor for the execution by or under the subcontractor of the whole or any part of such work.

*Honaker I,* 278 Md. at 459–60, 365 A.2d at 291; *see also Para,* 339 Md. at 249, 661 A.2d at 741–42; *Brady,* 308 Md. at 503, 520 A.2d at 726–27.

We have interpreted these requirements to mean that there must be

two contracts, one between the principal contractor and a third party whereby it is agreed that the principal contractor will execute certain work for the third party, and another between the principal contractor and a person as subcontractor whereby the subcontractor agrees to do the whole or part of such work for the principal contractor.

*Honaker I,* 278 Md. at 460, 365 A.2d at 291. In more recent opinions, we have used the terms "antecedent undertaking," "antecedent contract," or "principal contract" to refer to the contract between the principal contractor and a third party. *Para,* 339 Md. at 250, 661 A.2d at 742; *Lathroum v. Potomac Elec. Power Co., Inc.,* 309 Md. 445, 449, 524 A.2d 1228, 1230 (1987); *Brady,* 308 Md. at 504, 520 A.2d at 727. The "subcontract" is the contract that the principal contractor enters into with another entity for that entity to "do the whole or part" of the work that the principal contractor has an obligation to complete. *See Brady,* 308 Md. at 504, 520 A.2d at 727; *see Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio,* 346 Md. 573, 599, 697 A.2d 885, 898 (1997).

## C. Relationship of the Parties

Several documents govern the relationships of the parties, define WMATA's role in the construction of the Branch Avenue Station, and otherwise shed light on whether WMATA was a "statutory employer" of Rodrigues–Novo. These documents, which we discuss individually, include: (1) the WMATA Compact; (2) the Fifth Annual Capital Contributions Agreement (hereinafter "ICCA 5"); (3) the WMATA–Recchi Con-

tract (hereinafter the "Recchi Contract"); and (4) the Recchi–Pessoa Contract (hereinafter the "Pessoa Contract").

### 1. WMATA Compact

In 1966, the District of Columbia, the State of Maryland, and the Commonwealth of Virginia created WMATA by entering into an interstate compact called the Washington Metropolitan Area Transit Authority Compact (hereinafter the "Compact"). *See* D.C.Code § 9–1107.01 (2003) (containing the current provisions of the Compact); 80 Stat. 1324 (1966). One purpose of the Compact was "to create a regional instrumentality ... empowered ... to plan, develop, finance and cause to be operated improved transit facilities...." *Id.*, art. II, cl. 2. The Compact also provides that WMATA may:

(d) Construct, acquire, own, operate, maintain, control, sell and convey real and personal property and any interest therein by contract, purchase, condemnation, lease, license, mortgage or otherwise but all of said property shall be ... necessary or useful in rendering transit service or in activities incidental thereto ... [and]

\* \* \*

(f) Enter into and perform contracts, leases and agreements with any person, firm or corporation or with any political subdivision or agency of any signatory party or with the federal government, or any agency thereof, including, but not limited to, contracts or agreements to furnish transit facilities and service....

*Id.* art. V, cl. 12(d) & 12(f).

The Compact further authorizes WMATA to develop a plan for the regional mass transit system, which must include plans for "transit facilities," such as the "locations of terminals, stations, platforms,. [and] parking facilities...." The plan also must designate "the design and location" of the transit facilities, whether the facilities are to be "constructed or acquired by lease, purchase or condemnation," as well as "a

timetable for the provision of such facilities...." *Id.* art. VI, cl. 13(a).

In furtherance of the regional plan, WMATA is directed to "prepare and adopt a plan for financing the construction, acquisition, and operation" of any planned facilities. *Id.* art. VII, cl. 17(a). Financing of work on the Maryland portions of WMATA's mass transit system (hereinafter "Metro") must comply with the Compact, as set forth in Section 18(b):

Commitments on behalf of the portion of the Zone located in Maryland shall be by contract or agreement by the Authority with the Washington Suburban Transit District, pursuant to which the Authority undertakes to provide transit facilities and service in consideration for the agreement by said District to contribute to the capital required for the construction and/or acquisition of facilities specified in a mass transit plan ... and for meeting expenses and obligations incurred in the operation of such facilities.

*Id.* art. VII, cl. 18(b).

## 2. Fifth Interim Capital Contributions Agreement

In 1992, WMATA entered into the Fifth Interim Capital Contributions Agreement (hereinafter the "ICCA 5") with the Washington Suburban Transit District and numerous political subdivisions around the District of Columbia.[6] The Agreement provides that WMATA's funding "for [the] accomplishment of the construction program and related activities of the Metrorail System" comes from contributions from the political subdivisions as well as grants made by the Federal Transit Administration. In addition to the funding provisions, the ICCA 5 states that WMATA "will proceed with all practical dispatch to accomplish the construction program and related activities...." Under the terms of

---

6. The parties to the ICCA 5 included WMATA, Maryland's Washington Suburban Transit District, the District of Columbia, Arlington County (Virginia), Fairfax County (Virginia), the City of Alexandria, the City of Falls Church, the City of Fairfax, Montgomery County (Maryland), and Prince George's County (Maryland).

the ICCA 5, the construction of the Metrorail System includes the construction of four new line segments, one of which is "Branch Avenue."

The ICCA 5 allows the political subdivisions certain control over the management of the construction projects. For example, WMATA annually must submit a proposed rail construction budget to the political subdivisions, and a political subdivision "may recommend a change in station facilities (i.e. the size of a parking lot or structure or the size of a rail station bus facility or kiss-and-ride lot) within that [political subdivision] so long as the recommended change does not change the adopted regional alignment." Furthermore, the ICCA 5 provides remedies for the political subdivisions should the construction of the Metro not occur according to the agreed schedule:

> In the event that the Federal Transit Administration does not approve a real estate, design, or construction project ... or a project is significantly delayed for reasons beyond the control of any [political subdivision] and cannot be initiated in the year in which its commencement is scheduled in Exhibit 1, then the funds allocated for such project may be reassigned to any other project within the affected revenue producing line; alternatively, upon approval of the [WMATA] Board of Directors, funds may be advanced on an interim basis for [other projects] to other [political subdivisions] on such terms as the affected [political subdivision] may agree...."

Similarly, WMATA has certain rights under the ICCA 5 if any political subdivision does not provide the promised funding for a project. In particular, WMATA may "suspend or terminate any project or activity" if a political subdivision does not commit funds for that project or if the political subdivision "does not perform its obligation under its [Local Funding Agreement]." WMATA enters into such Local Funding Agreements with political subdivisions to "establish arrangements for their commitment to pay local contributions" to WMATA construction projects.

Exhibit 1 of the ICCA 5 is entitled "Washington Metropolitan Area Transit Authority Rail Construction Program." That Exhibit provides for the construction of the F Route of the Metrorail System (Branch Avenue) in Prince George's County, the part of the Metrorail System that Rodrigues–Novo was working on when he was injured.[7]

### 3. Recchi Contract

On February 16, 1996, WMATA and Recchi executed an agreement, under which Recchi would provide: "[c]onstruction of the Branch Avenue Station and 7,710 Lineal feet of line Section including 2,620 feet of precast segmental single box girder aerial section and 5,090 feet of retained-cut, retained fill and at-grade section; and at-grade parking for 3,370 vehicles." The section of the Recchi Contract entitled "Concrete Pavement" "specifies providing portland cement concrete pavements, plain or reinforced, on a prepared subgrade or base for vehicular traffic and parking in conformance with the sections to lines and grades as shown." The Recchi Contract also contains a section providing details of the construction of "Curbs, Gutters, and Walks," including the materials and mixes to be used as well as for the execution of all concrete work.

### 4. The Pessoa Contract

To complete the concrete paving according to its agreement with WMATA, Recchi engaged Pessoa, Rodrigues–Novo's immediate employer, to furnish the necessary labor, equipment, and supplies. The contract between Recchi and Pessoa, which refers specifically to the Recchi contract with WMATA, explains Pessoa's responsibilities with respect to the removal of any of its work that does not meet certain specifications:

[Recchi] and Engineer shall have the right to inspect [Pessoa's] Work and fabrication of materials at the Project, at

---

**7.** An addendum to Exhibit 1 discusses Metrorail construction in the District of Columbia and specifies various aspects of the construction project.

Subcontractor's plant, or elsewhere. Within twenty-four (24) hours after written notice from [Recchi], [Pessoa] shall proceed promptly to take down all portions of work and remove from the Project all materials, whether worked or unworked, which Engineer condemns or fails to approve and shall promptly make good all such work and all other work damaged or destroyed in removing or making good the condemned or unapproved work, all at no additional cost to [Recchi].

Rodrigues–Novo was injured while attempting to remove a section of concrete that Pessoa previously had incorrectly installed.

## II. Discussion

■ Our resolution of the present controversy is informed by the four elements set forth in *Honaker I* for determining statutory-employer status. As we discussed above, to meet the definition of a statutory employer under Section 9–508, WMATA must be:

(1) a principal contractor

(2) who has contracted to perform work

(3) which is part of his trade, business or occupation; and

(4) who has contracted with any other party as a subcontractor for the execution by or under the subcontractor of the whole or any part of such work.

*Honaker I,* 278 Md. at 459–60, 365 A.2d at 291.

WMATA asserts that it is a statutory employer under the Act because all of the elements of Section 9–508 of the Act are met. WMATA argues that it is a principal contractor that entered into a contract, the ICCA 5, to perform the construction of the Branch Avenue Station. The ICCA 5, in WMATA's view, was more than a funding agreement because WMATA had obligations to perform construction that were contingent on payment by the political subdivisions. In addition, WMATA contends that construction of Metrorail facilities is part of its "trade, business or occupation." To support this claim, WMATA points to the WMATA Compact, which creat-

ed WMATA "to plan, develop, finance, and cause to be operated improved transit facilities." WMATA further argues that its contract with Recchi constitutes a "subcontract" in which Recchi would execute by itself or subcontract "the whole or part" of the construction of the Branch Avenue Station. According to WMATA, Recchi then subcontracted with Pessoa, Rodrigues–Novo's employer, for work in executing parts of the Recchi contract for the Branch Avenue Station, including the work during which Rodrigues–Novo was injured.

Rodrigues–Novo claims that WMATA was not his statutory employer because WMATA has not satisfied the elements of Section 9–508 of the Act. Rodrigues–Novo disputes that the ICCA 5 constitutes a principal contract under which WMATA was obligated to perform construction of the Branch Avenue Station. Rather, according to Rodrigues–Novo, the ICCA 5 merely provides funding to WMATA and does not require WMATA to perform actual construction work. Rodrigues–Novo also claims that WMATA is a public utility and that its responsibilities regarding Metro development arise by legislative mandate, not by contract as required by Section 9–508. Moreover, Rodrigues–Novo takes the position that WMATA's "trade, business or occupation" is providing transportation services to the public, which does not entail constructing Metrorail facilities.

## A. Principal Contractor Who Has Contracted to Perform Work

We begin our analysis by examining whether WMATA entered into a "principal contract" as contemplated by the first two elements of the test set forth in *Honaker I.* To meet these elements, WMATA must be a "principal contractor" "who has contracted to perform work" for a third party. *Honaker I,* 278 Md. at 459–60, 365 A.2d at 291. This Court explained how the existence of the principal contract affects one's status as a statutory employer:

Although acting independently of the other, the principal contractor and the subcontractor, with his workmen employed in the execution of the work, were each, in his own

separate capacity, co-operating toward the execution of the whole of a particular work which the principal contractor had promised to perform; and the liability of the principal contractor to pay compensation to the employees of the subcontractor is confined to only these employees who were actually engaged in the execution of the whole or a portion of that one piece of work at the time of the injury.

It is this necessary employment of the employee of the subcontractor upon the piece of work which the principal contractor has agreed to perform that forms the basis of the statutory relation between the workman and the principal contractor. . . .

*Hubert,* 154 Md. at 166, 140 A. at 54–55. Again, in *M.A. Long Co. v. State Accident Fund,* 156 Md. 639, 645, 144 A. 775, 778 (1929), we described what is meant by a "principal contractor":

The meaning of [the predecessor of Section 9–508] is that, in order to create a principal contractor the statutory employer of a workman of a subcontractor, the subcontractor must be engaged in the work or a portion of the work which the principal contractor agreed to perform. Or, in other words, to create the principal contractor a statutory employer he must have contracted in the first instance to do the work himself, and subsequently sublet the whole or a portion of it to someone else.

In a number of cases, we have examined whether a party seeking statutory-employer immunity has entered into the necessary "principal contract." *Warren v. Dorsey Enterprises, Inc.,* 234 Md. 574, 579, 200 A.2d 76, 78 (1964) involved a worker who was injured while starting a stock car race at a raceway owned by Dorsey Enterprises. The worker's employer had contracted with Dorsey to conduct races at the track. *Id.* We held that Dorsey was not a principal contractor because "Dorsey did not contract to produce or stage stock car races." *Id.* In other words, because Dorsey did not have a contractual obligation to conduct the races, there was no principal contract and Dorsey was not a statutory employer.

We held, in *Honaker I*, that a development company was not a statutory employer because the company had not provided evidence of a principal contract. 278 Md. at 463, 365 A.2d at 293. The A.N. Miller Development Company owned property on which it was erecting a house. *Id.* at 456, 365 A.2d at 289. Miller enlisted the services of Orndorff and Spaid, Inc. to complete various parts of the house construction, including roof installation. Honaker, one of Orndorff's employees, was injured while working to install the roof. *Id* at 456–57, 365 A.2d at 289. Honaker and his wife filed a tort action against Miller, but the trial court granted summary judgment to Miller, concluding that Miller was a statutory employer and immune from suits alleging negligence. *Id.* at 457, 365 A.2d at 289–90. We reversed, holding that, because Miller did not present evidence of a contract to build the house, he was not a statutory employer. We explained:

> What is missing in the case *sub judice* is a contract on the part of Miller to build the house. It is true that Miller contracted with Orndorff for Orndorff to install the roof, but that work was not part of any work which Miller had, in the words of the statute, "contracted to perform." Thus, the contract between Miller and Orndorff was not a subcontract. The contract did not assign to Orndorff some of the obligations of another contract; it was not an agreement to perform a specified part or provide specified materials required for the completion of another contract; it was not a contract under or subordinate to a previous or prime contract. As Miller did not owe labor or services under another contract for the work Orndorff agreed to execute, Miller was not "a principal contractor" and Orndorff was not "a subcontractor" with respect to the contract between them.

*Id.* at 463, 365 A.2d at 293.

Honaker's case reached this Court again after being remanded for further proceedings in the trial court. *See Honaker II*, 285 Md. at 218, 401 A.2d at 1014. While on remand, Miller presented evidence that it had entered into a "custom building contract" with the two individuals "for whom the

house was being built." *Id.* at 225, 401 A.2d at 1018. In light of this evidence, we held that Miller, indeed, was a statutory employer under the Act and immune from Honaker's tort suit. *Id.* at 230, 401 A.2d at 1020.

In *Para,* we concluded that a land owner and developer had formed the requisite antecedent contract under Section 9–508. 339 Md. 241, 661 A.2d 737 (1995). Para was injured while working for Razzano & Fohner, a company that had contracted to perform excavation and trenching for a construction project of The Richards Group of Washington, Limited Partnership. *Id.* at 244, 661 A.2d at 739. The Richards Group was developing a subdivision of homes, and, before Para sustained his injury, had entered into a contract for the sale of one of the lots. Para's relatives sued The Richards Group for damages, claiming that the company was not a statutory employer because there was no antecedent contract. *Id.* at 247, 661 A.2d at 740. We held that the contract for the sale of the lot, even though it had been executed after the subcontract, constituted a principal contract under the Act. *Id.* at 256, 661 A.2d at 745.

In *Brady,* we decided that the Mass Transit Administration (hereinafter the "MTA") was not entitled to statutory-employer tort immunity because it had not presented evidence of an antecedent contract. 308 Md. at 505–06, 520 A.2d at 727–28. The MTA, an instrumentality of the Maryland Department of Transportation, entered into a contract with Hensel–Phelps Construction Company, which agreed to provide services for the construction of a subway station. *Id.* at 490, 520 A.2d at 720. Hensel–Phelps subcontracted with a sheet-metal company, whose employee died while working on the project. The employee's family sued MTA, but the trial court found that MTA was a statutory employer and entered summary judgment in its favor. *Id.* at 495, 520 A.2d at 722. We disagreed that MTA was a statutory employer because "it never entered into a principal or antecedent contract with a third party." *Id.* at 505, 520 A.2d at 727. We concluded: "Borrowing words of our predecessors, MTA never 'contracted in the first instance to do the work' itself." *Id.*

In a footnote, we mentioned that MTA had attempted, at oral argument, to present evidence of an alleged antecedent contract. *Id.* at 505 n. 22, 520 A.2d at 727 n. 22. We rejected MTA's attempt to present the evidence because it was not contained in the "record transmitted from the court below." *Id.* Consequently, having "no knowledge of what the contract contained," we refused to consider whether the evidence, a capital grant contract between the Maryland Department of Transportation and the United States, fulfilled the requirement of an antecedent contract. *Id.* We noted "parenthetically," however, that "a mere financing agreement, which grants funds for a construction project, between an owner or contractor and a third party will not give rise to an antecedent contract unless the agreement also requires that the owner or contractor perform work or services for the third party." *Id.*

In *Lathroum,* we refused to extend the tort immunity provided by the Act to cover the Potomac Electric Power Company (hereinafter "PEPCO"), a regulated public utility and supplier of electricity that had contracted with the injured worker's employer "to provide labor and miscellaneous services for several of PEPCO's power facilities." 309 Md. at 446, 524 A.2d at 1228. PEPCO argued that the required antecedent contract arose from its contractual relationship with the public to perform work or service. *Id.* at 451, 524 A.2d at 1230–31. We dismissed this argument:

> [W]e have never remotely recognized the type of relationship PEPCO contends is sufficient to give rise to an "antecedent undertaking" or "principal contract." In our view, the legislature never intended a "principal contract" to arise where there is a statutory duty on the part of a public utility to provide a regulated commodity to the public. Our cases make clear that the "principal contract" contemplated by the legislature is one in which a contractor agrees for stated consideration to perform some work or service according to plans, specifications or directions of a third party.

*Id.* at 450–51, 524 A.2d at 1230. Explaining why PEPCO's obligation to serve the public did not give rise to an antecedent contract, we stated:

Clearly, PEPCO's alleged contractual relationship with the public fails to meet this definition. PEPCO is not performing any work or service according to customer specifications or direction; it is merely providing a regulated commodity pursuant to statutorily mandated requirements. If indeed there is a contract in this case, it is more akin to a contract for the sale of a product, which this Court has concluded is not within he contemplation of the "statutory employer" provision of the Act.

*Id.* at 451, 524 A.2d at 1231 (footnote omitted).

In the instant case, WMATA submits the ICCA 5 as evidence of an antecedent contract for the construction of the Branch Avenue Station. Rodrigues–Novo argues that both *Brady* and *Lathroum* support his position that no antecedent contract existed. Seizing on the footnoted language in *Brady,* Rodrigues–Novo contends that the ICCA 5 is a mere funding agreement and not a principal contract under which WMATA is obligated to perform work. Additionally, Rodrigues–Novo emphasizes our opinion in *Lathroum* to argue that there was no antecedent contract because, like PEPCO in *Lathroum,* WMATA is a regulated utility, providing services to the public under a statutory mandate. We disagree with Rodrigues–Novo's analysis.

Rodrigues–Novo's reliance on the footnoted discussion in *Brady* misses the mark because the ICCA 5 is more than a funding agreement. WMATA concedes that one of the purposes of the ICCA 5 is to arrange for funding the continued development of the Metrorail system. The ICCA 5, however, also makes clear that WMATA has an obligation to perform actual work and services and that one of its obligations included the construction of the Branch Avenue station. The parties incorporated into the ICCA 5 an exhibit entitled "Washington Metropolitan Area Transit Authority Rail Construction Program," which sets forth a schedule for the extension of the "F Route (Branch Avenue)." The ICCA 5 requires WMATA to "proceed with all practical dispatch to accomplish the construction program and related activities in the sequence identified" in that exhibit. The ICCA 5, therefore,

provides for more than just the funds for the extension of the "F Route," which includes the Branch Avenue Station. It also obligates WMATA to perform the necessary work or services to construct the extension.

 We also reject Rodrigues–Novo's other argument that our opinion in *Lathroum* compels a result in his favor because WMATA, like PEPCO, is a public utility. Although WMATA is a quasi-governmental entity, its quasi-governmental character, alone, does not render Section 9–508 inapplicable. Rather, the specific terms of a contract and the rights and responsibilities of the parties to the contract determine whether it should be deemed a "principal contract" under the Act. When a contractor and a third party enter into a contract in which the contractor "agrees for stated consideration to perform some work or service according to plans, specifications or directions of a third party," that contract constitutes an antecedent contract, regardless of whether the contractor is a government instrumentality. Similarly, the fact that the third party is also a governmental entity does not, itself, deny the contractor the immunity available under Section 9–508.

Furthermore, contrary to Rodrigues–Novo's suggestion, the ICCA 5 is not a legislative mandate. We held that PEPCO's obligation to provide electricity was "statutorily mandated" because PEPCO was not "performing any work or service according to customer specifications or direction." *Lathroum,* 309 Md. at 451, 524 A.2d at 1231. This is not the situation in the present case. The ICCA 5, which governs the funding and construction of Metro facilities, unlike the statutory mandate to provide electricity, reflects a "give and take" that distinguishes a contractual agreement. The parties to the ICCA 5 have independent rights and responsibilities to ensure the completion of the construction program according to the balance of interests contemplated by the agreement. On one hand, the political subdivisions have some control over the construction outlined in the ICCA 5; WMATA must submit a budget annually to the political subdivisions and the WMATA

Board of Directors, which consists of six directors, two of whom have been appointed by Maryland's Washington Suburban Transit Commission. In addition, the political subdivisions may recommend changes to the station facilities as long as those changes comply with the overall regional plan, and, if a project is significantly delayed for reasons beyond the control of the political subdivision, funds for that project "may be reassigned to any other project." Balancing the rights of the political subdivisions, on the other hand, is WMATA's power under the ICCA 5 to suspend or terminate a particular project if a political subdivision has not submitted the required funding. WMATA's obligations to perform construction of Metrorail facilities, therefore, are different from PEPCO's statutorily mandated obligations.

We conclude that the first two elements of the *Honaker I* test have been satisfied in the present case because WMATA had entered into a principal contract to perform work or services needed for the construction of the Metrorail extension, the project on which Rodrigues–Novo was working at the time of his injury.

### B. WMATA's Trade, Business, or Occupation

Under Section 9–508, not only must a contractor show that it entered into a principal contract to perform work or service, but the work or service called for also must be part of the contractor's "trade, business or occupation." *See Honaker II,* 285 Md. at 225, 401 A.2d at 1017–18. Rodrigues–Novo maintains that WMATA does not meet this criterion because, in Rodrigues–Novo's view, WMATA is in the business of operating mass transit, not constructing facilities. Rodrigues–Novo views the construction of Metrorail facilities as an "ancillary precursor" to carrying out the business of providing public transportation. The WMATA Compact, when considered in light of our cases addressing this subject, leads us to conclude otherwise.

Our first discussion of a principal contractor's "trade, business or occupation" came in *Hubert,* 154 Md. at 159, 140 A. at 52. We held that the placement of tile performed by a

subcontractor was part of the trade, business, or occupation of a principal contractor that had entered into a contract for the construction of an office building. *Id.* at 167–68, 140 A. 52, 54–55. The tiling, we held, was part of a cooperative effort to execute "the whole of a particular work which the principal contractor had promised to perform." *Id.* at 166, 140 A. at 54.

In *State, Use of Reynolds v. Baltimore,* 199 Md. 289, 86 A.2d 618 (1952), we determined that work that is essential or integral to fulfilling the principal contractor's obligation is part of the principal contractor's business, trade, or occupation. In *Reynolds,* Rosoff was obligated under a contract with the City to excavate and line a water tunnel. *Id.* at 292, 86 A.2d at 619. Under that contract, Rosoff was required to use a type of "cage" "for hoisting men and materials during construction." *Id.* These cages operated in what are known as "head-frames," which Archer Iron Works, Inc. agreed by subcontract to erect and install. *Id.* Archer entered into a contract with Arthur Phillips & Co., which promised "to supply ironworkers and equipment for the assembly and erection of the hoists and lifts under Archer's supervision." *Id.* One of Arthur's employees sustained a fatal injury while attempting to install a headframe. The employees' dependents brought suit against Rosoff, but Rosoff claimed immunity from the suit under the statutory-employer provisions of the Act.

The crux of the question before us was whether providing headframes was part of Rosoff's business, trade, or occupation. *Id.* at 294, 86 A.2d at 620. In answering this question, we stated:

> The whole work of constructing the tunnel was let to Rosoff. The fact that the work of erecting the hoists was necessarily preliminary and appurtenant to the actual excavation does not make it any less an integral 'part of the work undertaken by the principal contractor'. It was within the contemplation of the parties that Rosoff should provide headframes to support the hoists and cages; in no other way could the excavated material be removed. Removal of spoil is an essential part of a tunnel-digger's 'trade, business or occupation.'

*Id.* at 294–95, 86 A.2d at 620. We concluded that the "installation of the headframes was an integral part of Rosoff's undertaking and in subletting that portion of the work we think he was a statutory employer within the meaning of [the Act]." *Id.* at 296, 86 A.2d at 621. Our reasoning here makes clear that a subcontractor's work is part of the contractor's business, trade, or occupation when that work is essential or integral to the completion of the principal contractor's business.

Relying on all of these cases, we have held that the installation of roofing was part of a home builder's trade, business, or occupation, even though the principal contractor, itself, was not equipped with the employees or materials to build a roof. *Honaker II*, 285 Md. at 229, 401 A.2d at 1019–20. We explained how roofing is an essential and integral part of "building and selling homes":

> There is no question but that Miller is in the business of building and selling homes. From time immemorial shelter from the elements has been regarded as one of the necessities of life. Any structure with four walls must have a roof on it before it may be considered a house. Thus, a contention that the installation of a roof is not part of the "trade, business or occupation" of building homes is without merit. Equally without merit is the claim that because Miller owns the land upon which it is erecting the houses which it sells, its "trade, business or occupation" does not include the construction of homes.

*Id.*

As evidenced by the WMATA Compact, construction of Metrorail facilities is part of WMATA's trade, business, or occupation. The Compact indicates that WMATA was created for a number of purposes, including "to plan, develop, finance and cause to be operated improved transit facilities." Thus, WMATA is in the business of developing the mass transit system in and around the District of Columbia. The development of this system cannot occur without the extension, improvement, and creation of Metrorail facilities. Indeed, to effectuate the development of Washington's mass transit, the

Compact empowers WMATA to "[c]onstruct, acquire, own, operate, maintain, control, sell, and convey real and personal property." Like tiling is essential to the construction of an office building and roofing is an integral part of home building, so is construction of Metrorail facilities essential for developing "improved transit facilities."

The Supreme Court's opinion in *WMATA v. Johnson*, 467 U.S. at 940, 104 S.Ct. at 2835-36, 81 L.Ed.2d at 781 supports this conclusion. There, the Court held that, under the Longshoremen's and Harbor Workers' Compensation Act, which formerly governed workers' compensation claims in the District of Columbia, "WMATA was entitled to immunity from tort actions" brought by the injured employee of a subcontractor. Although the Supreme Court was interpreting statutory language different from the Act in Maryland, its observations bolster our view that part of WMATA's trade, business, or occupation was the construction of mass transit facilities. The Court discussed WMATA's purpose, finding that WMATA "is charged with the construction and operation of a rapid transit system (Metro) for the District of Columbia and the surrounding metropolitan region." *Id.* at 927, 104 S.Ct. at 2829, 81 L.Ed.2d at 773. The Court added that, according to the Compact, "WMATA is authorized to hire subcontractors to work on various aspects of the Metro construction project" and that, "[s]ince 1966 WMATA has engaged several hundred subcontractors, who in turn have employed more than a thousand sub-subcontractors." *Id.*

Disagreeing that WMATA is in the business, trade, or occupation of constructing Metro facilities, Rodrigues–Novo likens WMATA to a supermarket chain that builds its own supermarkets. He claims that the construction of a Metro station, like the grocery chain's construction of a supermarket, is an "ancillary precursor" to doing business, not an essential or integral part of its undertaking. In support of this view, Rodrigues–Novo points to *Reynolds,* where we cited the Fourth Circuit's opinion in *Sears, Roebuck & Co. v. Wallace,* 172 F.2d 802 (4th Cir.1949). The worker in *Wallace* was employed by a subcontractor that agreed to perform altera-

tions to a storage warehouse owned by Sears. 172 F.2d at 803. The court in *Wallace* denied Sears statutory-employer immunity under Virginia's workers' compensation statute, determining instead that Sears "was in the business of selling merchandise," but it "was not in the construction business." *Id.* at 808.

We distinguished the *Wallace* facts in *Reynolds*, 199 Md. at 295, 86 A.2d at 620. As we discussed in greater detail above, we concluded in *Reynolds* that the "installation of the head-frames was an integral part" of the principal contractor's excavation project and that the principal contractor was a statutory employer. *Id.* at 296, 86 A.2d at 621. Distinguishing the facts in *Reynolds* from those in the *Wallace* case, we stated that, in contrast to the excavator, "Sears was not in the building trade at all" and "[t]he fact that the construction of a store was necessary or convenient to the conduct of its retail business did not convert it from a merchant to a builder by trade." *Id.* at 295, 86 A.2d at 620.

*Wallace* is readily distinguishable from the case before us for the same reason we distinguished it in *Reynolds*. Unlike Sears, which only builds stores as a means to carry out its principal function of selling merchandise, WMATA does not build Metro facilities merely out of "necessity" or "convenience." The development of the Metro system, which includes constructing Metro facilities, is not just a means to accomplish another goal. Developing the system is, itself, one of WMATA's principal purposes. It is a fundamental reason for its creation. Just because WMATA also engages in the operation of the Metro system does not mean that its business, trade, or occupation is limited to such operation. Rather, we believe that the construction of Metrorail facilities is part of WMATA's business, trade, or occupation.

### C. Subcontract for the Whole or Part of Principal's Work

Having concluded that WMATA is a principal contractor which contracted to perform work or services for a third party that is part of its trade, business, or occupation, we turn now

to the final element of the *Honaker I* test: whether WMATA subcontracted for the whole or part of the work or services required under the principal contract.

Whether there was a qualifying "subcontract" can be determined only by considering the scope of the principal's obligation. *See M.A. Long Co.,* 156 Md. at 645–46, 144 A. at 778. We have defined a subcontract as "a contract with a person who owes labor or services under another contract, to perform some or all of the services or labor due." *Para,* 339 Md. at 249, 661 A.2d at 742. If all or part of the principal's obligation is sublet to another, and the injury occurs in the course of fulfilling that obligation, a subcontract has been created under the Act. *M.A. Long Co.,* 156 Md. at 645–46, 144 A. at 778.

In *Great Atlantic & Pacific Tea Co.,* 346 Md. at 599, 697 A.2d at 898, we held that the defendant in a negligence case, Super Fresh, was not a statutory employer because it had not established as a matter of law that the necessary principal/subcontractor relationship existed. The plaintiff's husband was fatally injured while working for Supermarket Distribution Services, Inc. (hereinafter "SDS") at an A & P warehouse, which was managed by Super Fresh, a wholly owned subsidiary of A & P. *Id.* at 579, 697 A.2d at 888. SDS had a contractual obligation to provide "warehousing and distribution services." *Id.* Although we recognized the presence of a contractual relationship between A & P, Super Fresh, and SDS, we stated that the "record lacks conclusive evidence concerning the substance of the contractual obligations, if any, between SDS and Super Fresh, and any concomitant obligations to A & P." *Id.* at 599, 697 A.2d at 898. We held, therefore, that the record did not support the existence of a principal/subcontractor relationship between Super Fresh and SDS.

In this case, we have no trouble identifying the relevant contractual obligations. WMATA was obligated under the ICCA 5 to extend "F Route (Branch Avenue)." WMATA's contract with Recchi called for Recchi to complete "[c]onstruc-

tion of the Branch Avenue Station ... and at-grade parking for 3,370 vehicles." The contract also provides that the concrete pavement done by Recchi must be "prepared subgrade or base for vehicular traffic and parking" according to detailed specifications. Recchi is also obligated under the contract to provide curbs, gutters, and walks, which must be removed or replaced if placed unsatisfactorily.

To complete the concrete paving at the Branch Avenue Station, Recchi engaged Pessoa to furnish the necessary labor, equipment, supplies, and material. The agreement between Recchi and Pessoa requires Pessoa to "proceed promptly to take down all portions of work and remove from the Project all materials, whether worked or unworked, which [the] Engineer condemns or fails to approve." Rodrigues–Novo sustained his injury while working for Pessoa and while using a machine loader to break a driveway that had been built incorrectly. The work he was performing at the time of the injury was exactly that which Pessoa was obligated to complete according to its contract with Recchi and in furtherance of Recchi's commitment to WMATA.[8] We hold that the WMATA contract with Recchi constitutes a subcontract for the whole or part of the work or services required under the ICCA 5. Because each element of the *Honaker I* test has been satisfied, we further hold that WMATA was the statutory employer of Rodrigues–Novo at the time of his injury.

*CERTIFIED QUESTION ANSWERED AS SET FORTH ABOVE. PURSUANT TO § 12–610 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE, THE COSTS SHALL BE EQUALLY DIVIDED BETWEEN THE PARTIES.*

---

8. Rodrigues–Novo claims that the breaking of the concrete was "demolition" work that was not covered by the Pessoa contract. Rodrigues–Novo,.however, was not performing any "demolition" at the time of his injury. To the contrary, his efforts to break the incorrectly built driveway were carried out to effectuate the eventual proper construction of the driveway at the Branch Avenue Station. The Pessoa Contract required Pessoa to perform this exact type of work.